918 A.2d 27 (2007)
391 N.J. Super. 261
Amanda MASTONDREA, Plaintiff-Respondent,
v.
OCCIDENTAL HOTELS MANAGEMENT S.A., Defendant, and
Hotel Royal Playacar, S.A. de C.V., Defendant-Appellant and
Liberty Travel, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued telephonically December 6, 2006.
Decided March 9, 2007.
*29 Edmund J. Siegert, Chicago, IL, (Cremer Kopon Shaughnessy & Spina) of the Illinois bar, admitted pro hac vice, argued the cause for appellant Hotel Royal Playacar, S.A. de C.V. (McDermott & McGee, attorneys; Thomas A. Wester, Milburn, *30 and Joshua D. Yeager (Cremer, Kopon, Shaughnessy & Spina) of the Illinois bar, admitted pro hac vice, on the brief).
John H. Sanders II, argued the cause for respondent Amanda Mastondrea (Eichen Levinson & Crutchlow, attorneys; William O. Crutchlow, on the brief).
Before Judges KESTIN, WEISSBARD and PAYNE.
The opinion of the court was delivered by
PAYNE, J.A.D.
Defendant Hotel Royal Playacar, S.A. de C.V. (Hotel), a Mexican corporation, appeals by leave granted, from a trial court order denying the Hotel's motion to dismiss the complaint of plaintiff Amanda Mastondrea for lack of personal jurisdiction, finding New Jersey law applicable to plaintiff's personal injury action, and declining to dismiss her action on the ground of forum non conveniens. We affirm the jurisdictional and forum selection aspects of the order, but reverse the trial court's choice-of-law determination.
As the alleged result of a local advertisement in the Newark Star Ledger, plaintiff, a New Jersey resident, purchased through defendant, Liberty Travel, a vacation package for accommodations at an all-inclusive resort known as Royal Hideaway Playacar,[1] located in Quintana Roo, Mexico, owned by Occidental Hotels Mexico S.A. de C.V. and operated by defendant Hotel. The advertisement in question had been placed by Libgo Travel, Inc. (Libgo), working in conjunction with a Florida marketing entity known as Allegro Resorts Management Corporation (ARMC).
Libgo is an umbrella organization that includes defendant Liberty Travel, an East Coast retail travel chain, and GOGO Worldwide Vacations, a leisure travel wholesaler, as well as corporate, group and incentive divisions. Libgo's headquarters are in Ramsey, New Jersey. Liberty Travel, itself, does not appear to maintain a separate corporate existence.
On June 16, 2003, while at the resort, plaintiff slipped and fell on a wet exterior staircase, breaking her ankle. Upon her return to New Jersey, she filed a negligence action against the Hotel, Liberty Travel, and Occidental Hoteles Management S.A. (Occidental Hoteles), the Hotel's Spanish parent.
Motions to dismiss plaintiff's action on jurisdictional grounds and on the basis of forum non conveniens were filed by Occidental Hoteles and the Hotel, along with motions seeking a determination that the law of the Mexican state of Quintana Roo applied to the issues of comparative negligence and damages. Following jurisdictional discovery and a hearing, the court entered an order dismissing plaintiff's action against Occidental Hoteles on jurisdictional grounds. No appeal has been taken from that order. The present appeal arises from the court's additional order finding personal jurisdiction over the Hotel as the result of its advertising in New Jersey, and determining both that New Jersey law applies to the dispute and that New Jersey is an appropriate forum for its resolution.

I.
We first address the jurisdictional issue, which is a matter of law that we consider de novo. Vetrotex Certainteed *31 Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 150 (3d Cir.1996). We review the court's factual findings with respect to jurisdiction to determine whether they were supported by substantial, credible evidence under the standards set forth in Rova Farms Resort. Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974) and Jacobs v. Walt Disney World, 309 N.J.Super. 443, 452, 707 A.2d 477 (App. Div.1998).
At the outset, we note that plaintiff does not contend that general jurisdiction over the Hotel exists, but premises her arguments on specific jurisdictional grounds. Pursuant to that theory, plaintiff must demonstrate that the Hotel had minimum contacts with New Jersey, defined as purposeful acts by the Hotel directed toward this State, that make it reasonable for the Hotel to anticipate being haled into court here. Plaintiff must also demonstrate that those minimum contacts gave rise to the injury claimed by her. Giangola v. Walt Disney World Co., 753 F.Supp. 148, 155 (D.N.J.1990) (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980)). Our focus thus rests on the relationship between the Hotel, New Jersey, and plaintiff's litigation. Ibid. (citing Shaffer v. Heitner, 433 U.S. 186, 204-05, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683, 698 (1977)). The purpose of the requirement of evidence of purposeful acts is to ensure that a defendant will not be subject to a forum's jurisdiction solely on the basis of random or attenuated contacts or of the unilateral activity of another person or entity. Ibid. (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 542 (1985); Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404, 412-13 (1984); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790, 797 (1984) and World-Wide Volkswagen, supra, 444 U.S. at 299, 100 S.Ct. at 568, 62 L.Ed.2d at 502).
If plaintiff successfully demonstrates the existence of the requisite minimum contacts, then a further determination must be made whether the exercise of personal jurisdiction over the Hotel would offend traditional notions of fair play and substantial justice. Waste Management, Inc. v. Admiral Ins. Co., 138 N.J. 106, 121, 649 A.2d 379 (1994), cert. denied, sub nom. WMX Technologies, Inc. v. Canadian Gen. Ins. Co., 513 U.S. 1183, 115 S.Ct. 1175, 130 L.Ed.2d 1128 (1995). In reviewing the evidence supporting plaintiff's claim, we construe the State's long-arm jurisdictional provision, R. 4:4-4, as extending personal jurisdiction to the outermost limits afforded by due process under the United States Constitution. Avdel Corp. v. Mecure, 58 N.J. 264, 268, 277 A.2d 207 (1971).
When determining that specific jurisdiction existed over the Hotel in the present case, the trial court found that:
[I]t can be inferred that the hotel advertised both in print [and] media. . . . Moreover, these advertising efforts were successful, since the plaintiff chose the defendant's hotel because of the hotel advertisement [run] by Liberty in New Jersey.
It is apparent that by advertising in the Star Ledger and on television through Liberty, defendant actively sought to attract New Jersey residents and entice them in New Jersey and when it was effective, set the desired relationship in motion in New Jersey[. . . . T]his court is satisfied it is not unreasonable to subject a company that advertises in New Jersey and through patrons of its resorts, even though it did it through an intermediary. . . .
*32 The court further found that plaintiff's injury arose out of the Hotel's activities in this State, since she (a first-time visitor) would not have been present at the Hotel in the absence of the Hotel's advertisements.
We regard the trial court's evidentiary findings to be supported by the record in this matter. In reaching this conclusion, we note that although substantial jurisdictional discovery took place, the record is by no means clear, both because of imprecision in the identification of various entities bearing similar names and because of the absence of evidence regarding the precise corporate and contractual relationships between those entities. The Hotel has not measurably aided in the clarification of these foundational questions. In the circumstances, the trial court's use of inferences was warranted and well-founded.
It is unquestionably true that the Hotel has no direct presence in New Jersey. As we have stated, the Hotel's operations are located in Quintana Roo, Mexico. The Hotel is not registered, licensed or otherwise authorized to do business in New Jersey. It has no registered agent in this state for service of process, and it pays no state taxes. The Hotel maintains no business address here, it has never owned property or maintained any bank accounts in this state, and it has no employees in New Jersey.
However, the record contains two "Tour Operator Agreements" between the Hotel and Libgo that provide that the Hotel will allot a specific number of rooms at its resort to Libgo at agreed-upon rates. Libgo, as "tour operator," is then authorized by the Hotel to book those rooms on behalf of Libgo's customers. Pursuant to the contract, Libgo is required to provide the Hotel with weekly sales reports listing the number of rooms booked by Libgo and the rates at which those rooms were booked. It must also confirm all reservations in a writing sent to the Hotel.
Courts "have generally sustained the exercise of personal jurisdiction over a defendant who, as a party to a contract, has had some connection with the forum state or who should have anticipated that his conduct would have significant effects in that state." Avdel, supra, 58 N.J. at 271, 277 A.2d 207. Here, the Hotel entered into a contract with a New Jersey entity, Libgo, which agreed to solicit business for the Hotel and derived a profit from that solicitation through sales of vacation packages. Although Libgo's business extends beyond New Jersey and throughout much of the East Coast, at least part of its customer base resides in this state. Likewise, as a result of this contract, the Hotel purposefully and successfully sought vacationers from New Jersey, and it derived a profit from them. Therefore, the Hotel should have reasonably anticipated that its conduct would have significant effects in New Jersey.
Additionally, the record reflects that, as the result of the tour operator contracts, the Hotel and Libgo engaged in communications, financial dealings[2] and other contacts that emanated both from Mexico and New Jersey. These contacts, alone, may have been sufficient to establish jurisdiction. However, we are reluctant to give them dispositive weight, because plaintiff has not demonstrated that a Tour Operator *33 contract between the Hotel and Libgo was in effect at the time of plaintiff's accident (those in the record covering room allotments for the 2004 and 2005 calendar years[3]), nor has plaintiff established that her vacation package was encompassed within such a contract, since the lists of allotments forming the second page of the agreements in the record refer to "Liberty GoGo" as the "Tour Operator," and plaintiff has offered no evidence as to the relationship between Liberty Travel and Liberty GoGo or as to whether Liberty GoGo was involved in procuring the package that she booked.
Nonetheless, additional evidence of purposeful acts in New Jersey exist that fairly can be attributed to the Hotel and that are causally connected to plaintiff's decision to purchase the Hotel's vacation package. The record reflects an ongoing, but undefined, relationship between the Hotel and non-party ARMC, a Florida corporation, having its principal place of business in Miami. ARMC is a marketing organization that solicits business in the United States for the "Occidental Hotels & Resorts," a group of which the defendant Hotel is a part. ARMC does not have any direct contact with any of the potential customers of the various hotels that it promotes, and it does not itself sell travel or vacation packages. However, ARMC's Northeast Regional Director, Kathy Halpern, works closely with Libgo in developing marketing strategies for the Occidental Hotels & Resorts in the New Jersey area pursuant to cooperative marketing agreements between ARMC and Libgo.
Although specific evidence in the record is lacking, it can be inferred that a contractual or other business relationship exists between the Hotel and ARMC, by which ARMC is authorized to market the Hotel and the other members of the Occidental Hotel & Resorts group throughout the United States, including New Jersey, as well as in Canada. Uncontested allegations of ARMC's use of the term Occidental as its identifier in its business dealings in New Jersey and in Florida support the plaintiff's position that ARMC and the Hotel are closely allied, and that ARMC operates on the Hotel's behalf in the area of marketing with the Hotel's knowledge and consent. Doubtlessly, ARMC, a wholly-owned subsidiary of Occidental Hotels Management, B.V., a Netherlands corporation that is also the ultimate parent of the Hotel, did not perform its marketing endeavors for the Hotel as a volunteer.
The cooperative marketing agreement between ARMC and Libgo,[4] in effect at the time of plaintiff's injury, encompassed the three "brands" of hotels, Allegro, Grand, and Royal Hideaway (the resort at issue),[5] grouped under the trade name of Occidental Hotels & Resorts. These brands were sometimes advertised separately, and sometimes jointly under the Occidental designation. According to the testimony of ARMC employee Halpern, the agreement between ARMC and Libgo established a marketing budget, premised upon the level of sales of relevant vacation packages by Libgo entities in the prior year. ARMC then built marketing initiatives based on that specified dollar amount. In that connection, ARMC, through Halpern, worked with Libgo to *34 develop and implement a marketing plan that specified the marketing initiatives for the calendar year, including media insertions, brochure contributions, trade shows, and outside events. Although the plan was jointly developed, it was ultimately subject to the approval of ARMC Marketing Vice-President, Marcelo Radice, or another senior ARMC employee. According to Halpern, a media insertion schedule would be incorporated as part of the media plan. Once approved, Libgo would be responsible for placing ads, sending tear sheets containing copies of the ads to ARMC, and for initial payments to the various newspapers. Halpern indicated that "[t]he way a marketing agreement is paid for in terms of the cost, it is exactly what it states: it is cooperative. So the tour operator puts in some, as do[] the various hotels."
Halpern testified that she worked regularly at Libgo with its Vice-President of Marketing for Mexico and Latin America, Colette Baruth. Baruth, in turn, confirmed that she discussed ad placement with Halpern, and that she provided advice to her regarding the pricing of the Hotel's rooms in a particular market region. Further, Baruth confirmed that ARMC had the final decision regarding the placement by Libgo of advertisements featuring the Hotel in newspapers in New Jersey, including the Star Ledger advertisement that plaintiff claimed caused her to contact Liberty Travel. In this regard, the following exchange occurred:
Q. Has there ever been a time where the hotel company [ARMC] said: we don't want to advertise in a specific region 
A. Yes.
Q.  or a specific newspaper?
A. Yes.
Q. When was that?
A. It happens, probably, on a monthly basis. They [ARMC] can change dates, they can change newspapers, they can change time of year. They have complete flexibility.
A media insertion spreadsheet for the three hotel brands, including defendant Hotel, marked at Halpern's and Baruth's depositions, revealed billings for the year 2003 that totaled $145,485, an amount that included Newark Star Ledger costs of approximately $25,000, as well as placements in Gannett papers circulating in the New York  New Jersey area and in the New York Daily News. According to the spreadsheet, the defendant Hotel was featured, singly, that year in advertisements in the Newark Star Ledger on four occasions, including one in January 2003, prior to plaintiff's decision to book a vacation there.
We are satisfied, on the basis of the evidence that we have recounted, that for jurisdictional purposes, ARMC was operating as an agent of the Hotel when ARMC entered into cooperative marketing agreements with Libgo, and that ARMC's extensive contacts with Libgo in New Jersey regarding the marketing plan, together with the New Jersey fruits of that plan, can be attributed to the Hotel for jurisdictional purposes. Jacobs, supra, 309 N.J.Super. at 457, 707 A.2d 477 (recognizing that, although Walt Disney world (WDW) was a corporate entity separate from Disney Company's other subsidiaries, sufficient promotion of WDW's business by the other subsidiaries could support jurisdiction, and remanding for a hearing on the extent to which the subsidiaries furthered WDW's enterprises); see also Burger King, supra, 471 U.S. at 479 n. 22, 105 S.Ct. at 2186 n. 22, 85 L.Ed.2d at 545 n. 22; Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino, 960 F.2d 1217, 1226 n. 5 (3d Cir.1992); Wells Fargo Co. v. Wells Fargo Express Co., 556 F.2d 406, 419 (9th *35 Cir.1977); Ganis Corp. v. Jackson, 635 F.Supp. 311, 315 (D.Mass.1986), aff'd, 822 F.2d 194 (1st Cir.1987).
We are further persuaded that the targeted advertising conducted pursuant to the cooperative marketing agreement on behalf of the Hotel provided the minimum contacts necessary to support specific jurisdiction in this case. In Makopoulos v. Walt Disney World, 221 N.J.Super. 513, 535 A.2d 26 (App.Div.1987), certif. denied, 117 N.J. 661, 569 A.2d 1354 (1989), we recognized that "solicitation directed to New Jersey residents can support jurisdiction over foreign resorts." Id. at 516, 535 A.2d 26 (citing Radigan v. Innisbrook Resort and Golf Club, 150 N.J.Super. 427, 375 A.2d 1229 (App.Div.1977); Schaffer v. Granit Hotel Inc., 110 N.J.Super. 1, 264 A.2d 240 (App.Div.1970); and Oliff v. Kiamesha Concord, Inc., 106 N.J.Super. 121, 254 A.2d 330 (Law Div.1969)). In those cases, the solicitation through advertising was accompanied by direct contact with former guests located in New Jersey. However, in Makopoulos, we did not require those additional activities, but instead observed that sufficient solicitation in New Jersey could provide the sole basis for jurisdiction. 221 N.J.Super. at 516-19, 535 A.2d 26.
Makopoulos has been construed as unconstitutionally suggesting that jurisdiction may be premised upon national advertising alone. Giangola, supra, 753 F.Supp. at 155-56. Cf. Jacobs, supra, 309 N.J.Super. at 458-60, 707 A.2d 477 (discussing treatment by various courts of jurisdiction based on national advertising). In light of the determination, in Makopoulos, to remand the matter to permit discovery as to the extent to which defendant's advertising was specifically targeted to New Jersey, and the reservation of any decision regarding jurisdiction until such discovery was accomplished, we do not read Makopoulos as broadly as the court in Giangola suggests. In any event, jurisdiction in the present case is not premised upon general advertising, but rather, upon the New Jersey relationships between the Hotel's agent, ARMC, and Libgo, their cooperative marketing agreement and resultant plan, and the placement of targeted advertising in the Newark Star Ledger pursuant to that plan. We thus do not need to reach the issue whether jurisdiction can be premised upon purely general advertising, as discussed in Giangola.
Additionally, we are mindful of the probability of further, more extensive, direct contacts between the Hotel and Libgo as the result of the operation of Tour Operator Agreements between the two entities and of the likelihood that plaintiff's booking occurred as the result of such an agreement.[6] While the evidence in the record is insufficient to establish this point dispositively, the inference that this was the case is a strong one. In such case, not only did the Hotel enter into a contract with a New Jersey corporation with the knowledge of its effects in New Jersey, but also, by virtue of the contract, Libgo can be deemed to have performed as the Hotel's agent in booking rooms for residents of this state.
A similar circumstance existed in Catalano v. BRI, Inc., 724 F.Supp. 1580 *36 (E.D.Mich.1989), a case in which plaintiff was injured in a Las Vegas hotel, the El Rancho, booked through American Airlines. In finding that minimum contacts existed over the El Rancho sufficient to support jurisdiction over plaintiff's suit in his state of residence, Michigan, the court held:
the El Rancho purposely directed its activities at Michigan residents and had fair warning that it would be subject to suit in this jurisdiction. The El Rancho set aside up to 30 rooms per week to be sold by American Airlines, a national air carrier that regularly services flights to and from Michigan. The El Rancho set these rooms aside in an effort to sell rooms to persons who would not otherwise stay at the El Rancho. Without question, the El Rancho gave American Airlines authority to act as its agent for the purpose of selling El Rancho hotel rooms to persons located in any area serviced by American Airlines.
. . . .
The Court further finds that due process is not offended by subjecting defendant El Rancho Hotel to a trial in this forum. [Id. at 1583.]
The present case is even more compelling than Catalano as the result of Libgo's location in New Jersey and the parties' demonstrated focus on sales in the New Jersey market.
In sum, we conclude that plaintiff has sufficiently demonstrated that the Hotel had contacts with New Jersey, consisting of a likely tour operator contract and proven marketing activities through ARMC and Libgo in the relevant time period, and that a causal relationship existed between those activities and plaintiff's determination to book a vacation at the Hotel. See id. at 1582; Rutherford v. Sherburne Corp. 616 F.Supp. 1456, 1459-61 (D.N.J.1985) (discussing causal relationship). We therefore conclude that this evidence was sufficient to support the assertion of specific personal jurisdiction over the Hotel in this State.
We also concur with plaintiff's argument that an assertion by New Jersey of specific personal jurisdiction over this suit does not offend traditional notions of fair play and substantial justice. The Hotel is demonstrably a part of a world-wide travel empire well-equipped to defend litigation within the United States. It chose to market itself, through Libgo, in New Jersey, and thus can be deemed to have foreseen, and indeed to have induced, the presence of New Jersey guests at its Mexican facility. Much more occurred here than national advertising, the acceptance of bookings from independent travel agencies and the payment of commissions to those agencies.
"That some harms would follow and would result in claims" in New Jersey "was not only to be anticipated, it was predictable." Makopoulos, supra, 221 N.J.Super. at 517, 535 A.2d 26. "Fair warning" that the Hotel's activities might subject it to the jurisdiction of New Jersey's courts thus existed. Burger King, supra, 471 U.S. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d at 540. Moreover, the Hotel's activities were of a sort that gave New Jersey an interest in holding it to account for plaintiff's alleged injuries. Keeton, supra, 465 U.S. at 776, 104 S.Ct. at 1479, 79 L.Ed.2d at 798. Accordingly, we concur with the trial court's determination that plaintiff has met her burden of establishing the jurisdiction of New Jersey's courts over this personal injury suit, premised on specific personal jurisdictional grounds.

II.
The Hotel has also challenged the trial court's denial of its motion to dismiss *37 plaintiff's action on grounds of forum non conveniens, arguing that it would be inequitable to try the case in the forum that plaintiff has selected. An abuse of discretion standard governs our review of the court's decision, Kurzke v. Nissan Motor Corp. in U.S.A., 164 N.J. 159, 165, 752 A.2d 708 (2000). We perceive no such abuse in this case.
In its brief, the Hotel argues at length that the court failed to consider whether Quintana Roo, Mexico, constituted an adequate alternative forum to New Jersey  a determination that must precede any analysis of the public  and private-interest factors applicable in a forum-selection context. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506-07, 67 S.Ct. 839, 842, 91 L.Ed. 1055, 1061 (1947). We regard the adequacy of the Mexican legal system to resolve this case fairly to have been conceded. The Hotel's arguments in this regard are, thus, largely irrelevant.
In Kurzke, the Supreme Court recognized the public  and private-interest factors set forth in Gulf Oil as providing the proper analytical framework to aid courts in determining whether the plaintiff's choice of forum is appropriate. 164 N.J. at 165, 752 A.2d 708. The private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforceability of a judgment, if one is obtained." Gulf Oil, supra, 330 U.S. at 508, 67 S.Ct. at 843, 91 L.Ed. at 1062. As stated by the Gulf Oil Court,
It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.
[Ibid. (footnote omitted).]
The public interest factors include administrative difficulties that may follow for courts "when litigation is piled up in congested centers" rather than being handled at its origin; the burden of jury duty if the community has no relation to the litigation; in cases "which touch the affairs of many persons," the importance of holding trials locally; and the local interest in having "localized controversies" decided at home. Id., 330 U.S. at 508-09, 67 S.Ct. at 843, 91 L.Ed. at 1062-63. See also, e.g. Kurzke, supra, 164 N.J. at 165-66, 752 A.2d 708; D'Agostino v. Johnson & Johnson, Inc., 225 N.J.Super. 250, 263, 542 A.2d 44 (App.Div.1988), aff'd, 115 N.J. 491, 559 A.2d 420 (1989).
In evaluating these factors, the court is not permitted to engage in a mere balancing test. A plaintiff's choice of forum "may not be defeated upon a mere balance of conveniences." Kurzke, supra, 164 N.J. at 170, 752 A.2d 708 (quoting D'Agostino, supra, 225 N.J.Super. at 262, 542 A.2d 44). As the Kurzke Court observed:
New Jersey courts should be especially accommodating to their own citizens seeking justice at home. "[A]n action by or against a resident will ordinarily not be dismissed as being in an inconvenient forum. . . ." [Gore v. United States Steel Corp., 15 N.J. 301,] 311, 104 A.2d 670 [(1954).] Although domestic residence is not decisive, "there is a strong presumption in favor of retaining jurisdiction where the plaintiff is a resident who *38 has chosen his [or her] home forum." D'Agostino, supra, 225 N.J.Super. at 262, 542 A.2d 44 (citation omitted). [Id. at 171, 752 A.2d 708.]
A dismissal on grounds of forum non conveniens requires that the defendant show the choice of forum is "demonstrably inappropriate." Id. at 171-72, 752 A.2d 708.
In addressing the private interest factors, the Hotel points to Mexico as the locus of the accident, and it argues that the physical evidence and witnesses are present there. It also addresses the fact that the Mexican witnesses are not within the subpoena power of the New Jersey courts, and it notes the language difference between Mexico and the United States, positing difficulties arising from the need for translation, but failing to demonstrate that they would be unduly burdensome.
In the main, the Hotel's arguments would be better expressed by plaintiff, upon whom the burdens of discovery and presentation of evidence at trial lie. Nothing but cost hinders the Hotel from appearing in court in New Jersey with its employee-witnesses  an expense that similarly would be borne by plaintiff were she and her New Jersey witnesses to travel to Mexico. See Lehman v. Humphrey Cayman, Ltd., 713 F.2d 339, 343 (8th Cir. 1983), cert. denied, 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984) (finding, on similar facts, no exceptional circumstances that would justify denying plaintiff's choice of forum); Madan-Russo v. Grupo Posada, S.A. de C.V., 366 N.J.Super. 420, 429, 841 A.2d 489 (App.Div.), certif. denied, 180 N.J. 448, 852 A.2d 187 (2004) (finding no basis to conclude that defendant would suffer a greater burden in transporting Mexican witnesses to New Jersey than plaintiff would suffer if travel were reversed).
There has been no showing that any Mexican non-employee witnesses are unavailable to the Hotel in Mexico for purposes of de bene esse deposition, should their testimony be favorable to the Hotel, or that those witnesses would be more available if trial were to be conducted in Mexico. Lehman, supra, 713 F.2d at 343 (commenting on increased use of modern means of discovery and communication); Madan-Russo, supra, 366 N.J.Super. at 428-29, 841 A.2d 489 (noting potential for use of deposition and videotaped testimony at trial, and the absence of evidence that, if trial occurred in Mexico, Mexican authorities would assist in locating witnesses whose whereabouts were unknown).
Further, should it be relevant to the Hotel in defending the action, it is free to make an accurate videotape of the steps upon which plaintiff fell and to show that videotape to the jury, if the steps remain in the condition that they were in at the time of plaintiff's accident, and other evidentiary conditions are met. Madan-Russo, supra, 366 N.J.Super. at 430, 841 A.2d 489. If the Hotel determines that third parties may be liable for plaintiff's injuries, and those parties are not subject to the jurisdiction of New Jersey's courts, any claims for indemnification can be pursued at a later date in Mexico. Lehman, supra, 713 F.2d at 343-44; Olympic Corp. v. Societe Generale, 462 F.2d 376, 379 (2d Cir. 1972).
This case differs from Kurzke, a New Jersey product liability action against the manufacturer of an automobile in the United States arising from an car accident in Germany. In Kurzke, the Supreme Court held that defendant's motion to dismiss on grounds of forum non conveniens was premature, because substantive discovery had not commenced, and the manufacturer had not yet made a good faith effort to obtain the German discovery that it claimed would be unavailable if trial took place here. Kurzke, supra, 164 N.J. at 168, 752 *39 A.2d 708. The Court observed that "[m]ere speculation about potential inadequacies ordinarily is not a sufficient basis to deny the plaintiff the choice of forum." Ibid.
In the present case, the type of difficulty in obtaining discovery in a foreign country envisioned by the automobile manufacturer in Kurzke does not exist, because the Hotel can operate, for liability discovery purposes, on its own turf and in its own language. Despite the lack of any evidence, here, of an attempt to obtain discovery or prepare for trial that was thwarted as the result of the venue of the action, we do not regard the Hotel's motion to have been decided prematurely. The Hotel's arguments, as they relate to the private factors, are simply inadequate. If future events prove otherwise, the Hotel may revisit the issue. Id. at 167, 752 A.2d 708 (quoting Kurzke v. Nissan Motor Corp., 320 N.J.Super. 386, 402-03, 727 A.2d 481 (App.Div.1999) (Wefing, J.A.D., dissenting)).
As the trial court recognized in deciding the Hotel's motion, this matter closely resembles Madan-Russo, supra, and we regard the court's reliance upon our decision in that matter, in the circumstances presented, to have been well-founded. In Madan-Russo, plaintiff filed suit in New Jersey against a Mexican hotel after she allegedly had been sexually assaulted by a masseur employed by the hotel but fired after the incident. Following denial of motions by the hotel to dismiss on grounds of lack of personal jurisdiction and forum non conveniens, the hotel appealed the latter, claiming that the proper forum for plaintiff's action was Mexico. We rejected that argument, observing that because of the existence of witnesses in both Mexico and the United States, "the conduct of this litigation would generate practical witness problems whether tried in New Jersey or Mexico," and concluding that the defendant hotel would suffer no greater burden in transporting its witnesses, most of whom were its employees, to New Jersey than would be suffered by plaintiff were trial conducted in Mexico. 366 N.J.Super. at 429, 841 A.2d 489. We continued by stating that "[e]ven assuming it cannot transport these witnesses to New Jersey, our Court Rules permit the use of deposition and videotaped testimony at trial." Ibid.
Moreover, we found in light of the potential availability of photographs, videotape or diagrams, that the ability of a jury to view the premises where the assault allegedly occurred was of "no significance." Id. at 430, 841 A.2d 489. Significantly, we additionally stated:
We also find no substance to the argument that the potential application of Mexican law should weigh in favor of dismissing plaintiff's complaint in New Jersey. The case is an uncomplicated tort action. We firmly believe that the trial judges of this State are perfectly capable of determining any choice of law issues presented and applying foreign law if required.
[Id. (citing Lehman, supra, 713 F.2d at 345.])
In Madan-Russo, we also addressed the public interest factors, and in that context, determined that New Jersey's interest in protecting its own citizens and providing a forum for redress of allegedly wrongful conduct outweighed Mexico's interest in regulating its hotel, tourist industry, and protecting the population in general. Id. at 427-28, 841 A.2d 489. We thus concluded that no justifiable reason had been presented by defendant for denying the plaintiff her choice of a New Jersey forum. Id. at 430, 841 A.2d 489.
After reviewing the facts in the present case in light of the private and public-interest *40 factor analysis of Madan-Russo and other applicable precedent, the trial court concluded that the Hotel had not met its burden of establishing that the plaintiff's choice of forum was demonstrably inappropriate or that it was designed to subject the Hotel to harassment and vexation. We find no abuse of discretion in this conclusion, and therefore affirm it.

III.
We do, however, differ with the trial court's decision with respect to choice of law, a purely legal issue that we review de novo. Rowe v. Hoffmann-La Roche, Inc., 383 N.J.Super. 442, 452, 892 A.2d 694 (App.Div.2006).
The issues raised by the Hotel as to which a choice-of-law determination was sought are (1) whether contributory or comparative negligence standards are applicable in this matter and (2) whether any damages recoverable by plaintiff are to be measured by the law of Quintana Roo or by New Jersey law.
The affidavit of Alejandro Ortiz Prieto, an attorney admitted to practice in Mexico, New York and Texas, offered in connection with the Hotel's choice-of-law motion establishes without contradiction that the law of Quintana Roo, not federal Mexican law, would apply to the issues identified by the Hotel, and that such law is civil-law based, not common-law based. It further establishes that Quintana Roo would apply a strict contributory negligence standard to plaintiff's claim, and that it does not recognize comparative negligence. As a final matter, the affidavit establishes that the law of Quintana Roo recognizes compensatory damages and damages for emotional distress, but limits those damages to defined circumstances and amounts.[7]
Prieto explained the principles and policies behind the damage theory adopted by Quintana Roo as follows:
[It] is to make people whole for damage caused to them by a person who breached a law or who acted with negligence or fault. The Mexican legal system also recognizes that in some of the tort actions it is very difficult to determine the economic amount of damages, particularly as it relates to the perjuicio [compensatory] element and the emotional distress claims (daño moral). With that in mind, the legislature created in the law an objective road map to quantify the damage. One of the main principles of the Mexican legal system[] is to give the same legal treatment to all the people in the same legal scenario. This provides legal security (seguridad juridica) to the system, which is the founding stone of the legal system for the countries that follow the civil law. The Mexican legislators have decided that the best way to create legal security is with objective quantification methods[,] and limitations in the amount of subjective considerations[,] when calculating the amount of damages.
New Jersey, in contrast, recognizes comparative negligence, N.J.S.A. 2A:15-5.1, and does not statutorily restrict compensatory damages or damages for emotional distress, but instead entrusts the jury with their determination under principles of reasonableness, fairness, and full compensation. Theobold v. Angelos, 40 N.J. 295, 304, 191 A.2d 465 (1963). Conflicts of law thus exist.
*41 The resolution of choice-of-law determinations in tort actions requires an issue-by-issue approach. Erny v. Estate of Merola, 171 N.J. 86, 95, 792 A.2d 1208 (2002). And they are to be decided in accordance with New Jersey's choice-of-law rules, when New Jersey is the forum state. Fu v. Fu, 160 N.J. 108, 117-18, 733 A.2d 1133 (1999). In actions such as this, New Jersey applies a "governmental interest" test "that seeks to apply the law of the state with the greatest interest in governing the specific issue in the underlying litigation." Id. at 118, 733 A.2d 1133.
Once the existence of a conflict has been recognized, the court must determine which state has the most significant relationship to the occurrence and the parties with respect to the issue to be determined. Erny, supra, 171 N.J. at 96, 792 A.2d 1208; see also Restatement (Second) of Conflict of Laws § 145(1) (1971) (Restatement). Contributory and comparative negligence have been recognized as liability doctrines, Erny, supra, 171 N.J. at 97, 792 A.2d 1208, whereas the measure of compensation to be received by plaintiff is an issue of damages. We analyze each separately.
The rule of Restatement § 145 has been deemed appropriate for choice-of-law determinations concerning contributory and comparative fault. Restatement § 164; Erny, supra, 171 N.J. at 96, 792 A.2d 1208. Section 164(2) provides that the applicable law will usually be the local law of the state where the injury occurred  in this case, Quintana Roo. Restatement § 146 further provides:
In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties, in which event the local law of the other state will be applied.
We addressed a similar choice-of-law issue in O'Connor v. Busch Gardens, 255 N.J.Super. 545, 605 A.2d 773 (App.Div. 1992), determining in that personal injury action involving a New Jersey resident injured in Virginia, to apply the law of Virginia, which, like Quintana Roo, applied traditional contributory negligence principles to such tort actions. We first identified the governmental policies underlying the law of each state and determined how those policies were affected by the state's contacts to the litigation and the parties. Id. at 548, 605 A.2d 773. In doing so, we recognized that: "If a state's contacts are not related to the policies underlying its law, the state has no interest in having its law apply." Ibid. (citing D'Agostino, supra, 255 N.J.Super. at 315-17, 605 A.2d 252).
It is uncontested that Quintana Roo's interest in the application of its contributory negligence principles to plaintiff's negligence claim arises from its perceived need to regulate the conduct of its hotel managers and employees. The State has a similarly strong interest in controlling conduct among tourists who provide a significant portion of the country's economic wealth. It also has an interest in maintaining the predictability of its tort laws, among others, as such laws have an impact on Mexico's economy both generally and through its tourist industry. Cf. Hernandez v. Burger, 102 Cal.App.3d 795, 162 Cal.Rptr. 564, 568 (1980) (recognizing protection of the tourist industry as significant in a damages context).
The interest of Quintana Roo is thus directly related to the liability issue of comparative negligence that the Hotel has raised.[8] New Jersey has an "interest in *42 the fair compensation of injured New Jersey residents." O'Connor, supra, 255 N.J.Super. at 549, 605 A.2d 773. Additionally, it has sought through legislation to lessen the penalties upon an injured person who shares responsibility for the injury. Ostrowski v. Azzara, 111 N.J. 429, 437, 545 A.2d 148 (1988); see also Van Horn v. William Blanchard Co., 88 N.J. 91, 94, 438 A.2d 552 (1981) (noting that enactment of comparative negligence ameliorated the harsh consequences of contributory negligence that barred a minimally negligent plaintiff from any recovery).
While New Jersey has legitimate concerns, as in O'Connor, "it cannot exempt them from other states' law setting standards for local conditions and conduct." 255 N.J.Super. at 549, 605 A.2d 773. As we stated in O'Connor:
If New Jersey's comparative negligence doctrine followed [plaintiff] onto [the ride where she was injured] in Virginia, it would follow her into every other state as well, and would supplant local liability rules wherever she went. That would be an impermissible intrusion into the affairs of other states.
It is irrelevant that, for its own affairs, New Jersey prefers the comparative negligence doctrine. The test we apply does not permit us to weigh the relative desirability of competing substantive rules of law. That evaluation has already been made by the most interested state, and it is the forum state's duty to disregard its own substantive preference.
[Id. at 549-50, 605 A.2d 773.]
See also Fu, supra, 160 N.J. at 130-31, 733 A.2d 1133 (citing O'Connor for the proposition that New Jersey's status as the forum state is irrelevant to the choice of law, and that it is the duty of the forum state to disregard its own substantive preference).
After noting that our holding in O'Connor was consistent with Restatement §§ 145 and 164, we held in that case that Virginia, "as the place of the alleged negligence on the part of one or both of the parties, has the most significant relationship to the parties and the occurrence with respect to the contributory-vs.-comparative negligence conflict." Id. at 551, 605 A.2d 773. We thus determined that Virginia law was applicable to the issue.
We see no need in the present matter to depart from the precedent established in O'Connor, a case that, as we have noted, was cited with approval by the Supreme Court most recently in Fu. 160 N.J. at 130-31, 733 A.2d 1133. As the court stated in Shuder v. McDonald's Corp., 859 F.2d 266, 272 (3d Cir.1988), another case discussing choice-of-law considerations applicable to a New Jersey plaintiff injured in Virginia: "Surely Virginia has an interest in how persons conduct themselves within the state. The place of the accident was not fortuitous . . . rather, the accident arose from the use of and condition of property, traditionally matters of local control." Shuder's rationale is equally applicable here, as well.
A further rationale for this position was expressed by Judge Posner in Spinozzi v. ITT Sheraton Corp., 174 F.3d 842 (7th Cir.1999). There, he stated, when discussing modern choice-of-law rules in the context the application of Mexican standards of strict contributory negligence to claims of injury by an Illinois resident:

*43 [I]n the absence of unusual circumstances, the highest scorer on the "most significant relationship" test is [] the place where the tort occurred. For that is the place that has the greatest interest in striking a reasonable balance among safety, cost, and other factors pertinent to the design and administration of a system of tort law. Most people affected whether as victims or as injurers by accidents and other injury-causing events are residents of the jurisdiction in which the event takes place. So if law can be assumed to be generally responsive to the values and preferences of the people who live in the community that formulated the law, the law of the place of the accident can be expected to reflect the values and preferences of the people most likely to be involved in accidents  can be expected, in other words, to be responsive and responsible law, law that internalizes the costs and benefits of the people affected by it.
Only a tiny fraction of hotel guests in Mexico are from Illinois. Illinois residents may want a higher standard of care than the average hotel guest in Mexico, but to supplant Mexican by Illinois tort law would disserve the general welfare because it would mean that Mexican safety standards (insofar as they are influenced by tort suits) were being set by people having little stake in those standards.
[Id. at 844-45 (citations omitted).]
It would be unreasonable, Judge Posner concluded, for an Illinois tourist to have "thought he was carrying his domiciliary law with him, like a turtle's house, to every foreign country he visited." Id. at 846. For if he were successfully to do so, his assumptions would render a hotel susceptible to the varying tort standards of care and liability of the place of residence of each of its injured guests. In these circumstances, negligence would become strict liability. Id. at 845. We agree that choice-of-law principles do not dictate such a result, but instead work to establish uniformity in the application of the laws of an affected jurisdiction.
As a final matter, we turn to the issue of damages, noting as we did previously, that the laws of Quintana Roo limit both the amount of damages and the manner in which they will be measured, whereas, in New Jersey, an award of damages is limited only by what will fairly and reasonably compensate the injured party for all of the injuries sustained. Caldwell v. Haynes, 136 N.J. 422, 433, 442, 643 A.2d 564 (1994). Thus, a degree of predictability with respect to the quantum of damages exists in Quintana Roo that is absent in New Jersey.
Having found a conflict to exist, we, again, look to the governmental policies underlying the law of each jurisdiction and how those policies are affected by the contacts of each to the litigation and the parties. Erny, supra, 171 N.J. at 101, 792 A.2d 1208. In doing so, we do not find New Jersey precedent as directly analogous as that presented by O'Connor. We therefore directly consider the five factors drawn from section 145 of the Restatement, namely: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Fu, supra, 160 N.J. at 122, 733 A.2d 1133. Of these interests, the most important is the competing interests of the states, requiring our focus on "what [policies] the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, [on] whether these concerns will be furthered by applying that law to the multi-state situation." Id. at 125, 733 A.2d *44 1133 (quoting Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 198, 712 A.2d 634 (1998)). Additionally we must determine "whether application of a competing state's law would frustrate the policies of other interested states." Id. at 122, 733 A.2d 1133. And, in a tort case, we must also consider "the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of a state's local law." Id. at 123, 733 A.2d 1133 (citing Restatement § 145 cmt. c). The interests of the parties and of judicial administration are of less significance, but require our consideration.
We must also take into account the contacts with the litigation that are specified in Restatement § 145:(1) the place where the injury occurred (Quintana Roo); (2) the place where the conduct causing the injury occurred (Quintana Roo); (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties (divided between New Jersey and Quintana Roo); and (4) the place where the relationship, if any, between the parties is centered (as it applies to the Hotel, Quintana Roo).
As the Court noted in Erny:
In personal injury cases, the place of the injury is important, and when both the conduct and the injury occur in the same place, that jurisdiction's law generally will apply except in those rare instances where another jurisdiction has a demonstrably dominant interest and no policy of the situs state is frustrated by application of the sister state's policy.
[171 N.J. at 103 (citing Restatement § 145 cmt. e; § 146 cmts. c and d).]
A consideration of these well-accepted principles compels the conclusion that the law of Quintana Roo, the situs state, should be applied to the issue of damages as well as to the issue of comparative negligence. Through adoption of its legal code, Quintana Roo has expressed a strong interest in objectification of the criteria for damage awards, thereby achieving a level of certainty that is absent from common-law damage considerations. Application of New Jersey law would clearly frustrate the policies of the situs state, while not measurably increasing the deterrent value of the damage award. We have been presented in this case with nothing that would suggest that, in the circumstances set forth, New Jersey's interest should dominate, thereby frustrating the interests of Quintana Roo.
As a New York judge has observed when considering a similar choice-of-law question:
Mexico has a strong substantive interest in encouraging the development of a tourist industry. This includes protecting the reasonable and justifiable expectations of commercial and resort entities within its borders from the severe uncertainty of financial liability arising out of suits in the United States and other foreign jurisdictions.
[Feldman v. Acapulco Princess Hotel, 137 Misc.2d 878, 520 N.Y.S.2d 477, 486 (Sup.Ct.1987) (footnotes omitted).]
As the Feldman court observed, "Mexican resorts rely on the validity and applicability of their own Mexican damage status in business, financial and commercial planning." Id. at 486 n. 20. It would be unreasonable to expect those resorts to incorporate the damage provisions of their guests' places of domicile into their financial planning, in that manner impairing Mexico's interest in protecting its essential tourist industry. Ibid.
We recognize that our decision with respect to choice of law creates a burden for the attorneys and the judge trying this matter. At oral argument, we were informed *45 that Quintana Roo's legal code is available in English. Additionally, consultants in international law may be retained to clarify any remaining issues. In light of these factors, we do not find the burden to be an insurmountable one, or one sufficient to impel us to adopt a contra-legal position on the choice-of-law issues. Cf. Madan-Russo, supra, 366 N.J.Super. at 430, 841 A.2d 489.
As a consequence, we affirm the trial court's order denying defendant's motion to dismiss for lack of personal jurisdiction and on grounds of forum non conveniens. We reverse its order on choice of law, having determined that the law of Quintana Roo is applicable to the issues raised.
NOTES
[1] Discovery revealed that the name of the hotel varied, over time, to meet marketing demands. It is also designated as Occidental Royal Hideaway Resort & Spa Playacar and as Royal Hideaway Playacar by Occidental.
[2] According to Colette Baruth, Libgo's Vice-President of Marketing for Mexico and Latin America, a customer who purchased a vacation package from Liberty Travel would travel to the Hotel with a voucher, which would be delivered to the Hotel upon check-in. The voucher would then be returned to the travel company, which would reimburse the Hotel for the value of the voucher as payment for services rendered.
[3] However, the 2004 contract bears the date of April 21, 2003, which precedes the date of plaintiff's accident.
[4] It is unclear whether the Hotel was also a party to this agreement.
[5] Halpern testified that, although there were a number of hotels bearing the name Allegro or Grand, there was only one Royal Hideaway, that in Playacar, Mexico.
[6] While offering no details, the Hotel conceded in briefing before the trial court that it was "listed as a party to the Agreement with LIBERTY TRAVEL." It did not dispute that the contract was effective on the day of plaintiff's accident, nor did it claim that plaintiff's booking was not governed by the contract. It merely argued that: "the moving Defendant is not being sued by a party with whom it was in a contractual relationship. The moving Defendant did not enter into any contract with Plaintiff, written or otherwise, in New Jersey."
[7] No evidence was presented that would quantify the difference in damages available in New Jersey and Quintana Roo.
[8] Quintana Roo's interest is in fact similar to that of Virginia, which we found to be a "significant interest in deterring unsafe property conditions and unsafe conduct of people and enterprises located there." O'Connor, supra, 255 N.J.Super. at 549, 605 A.2d 773. See also Shuder v. McDonald's Corp., 859 F.2d 266, 271 (3d Cir.1988) (recognizing Virginia's interest in protecting defendants from claims and in holding down insurance costs).