# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2324-22

JANE DOE,

     Plaintiff-Appellant,

v.

DIOCESE OF ALLENTOWN,

     Defendant-Respondent.

_____

> Argued April 16, 2024 – Decided August 2, 2024
>
> Before Judges Rose, Smith and Perez Friscia.
>
> On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-3191-19.
>
> M. Stewart Ryan argued the cause for appellant (Laffey, Bucci & Kent, LLP, attorneys; M. Stewart Ryan, on the briefs).
>
> Elizabeth R. Leong argued the cause for respondent (Robinson & Cole, LLP, attorneys; Elizabeth R. Leong, of counsel and on the brief).

PER CURIAM

Plaintiff Jane Doe appeals the Law Division's February 22, 2023 order granting defendant Diocese of Allentown's (Diocese) motion to dismiss for lack of personal jurisdiction. We affirm for the reasons that follow.

I.

In 1972, Joseph Rock was ordained as a priest in the Diocese and remained in its ministry until he retired in 2001.[1] The Roman Catholic Church Diocese of Allentown is organized pursuant to the Code of Canon Law of the Church with a principal place of administration in Allentown, Pennsylvania. The Diocese serves approximately 250,000 members of the Catholic faith in five counties in the east and central part of Pennsylvania. The Diocese does not maintain any parishes, missions, pastoral centers, or schools outside these five counties. The Diocese additionally does not own or lease any property or provide any religious or educational services in New Jersey.

In 1974, when she was thirteen years old, plaintiff met Rock at a religious convention in Atlantic City.[2] Rock was already "known to her family and was a well-respected family friend." Rock offered to babysit Doe, which Doe's

---

[1] Rock was defrocked in 2005.

[2] Plaintiff does not allege Rock was attending the conference in his official capacity as a priest or at the direction of the Diocese.

A-2324-22

mother permitted. From the start, Rock repeatedly sexually abused plaintiff over an approximately eleven-year period.

Plaintiff recounted Rock's abuse occurred not only at her home when Rock would visit, but also during trips with Rock, including some trips out of state. For example, Rock abused plaintiff: during two trips to Atlantic City in 1974 and 1975; at her grandmother's house in Bradley Beach, from 1974 to 1979; in New York from 1975-1978; and in other locations including Allentown, Bethlehem, and Reading, Pennsylvania. Rock repeatedly threatened plaintiff to intimidate her from reporting the abuse. Still, plaintiff attempted on one occasion to disclose the abuse to her mother, who rejected plaintiff's claim "because he was a priest."

Plaintiff alleges the Diocese knew of Rock's misconduct and abuse of children. The record includes a 1986 letter to Diocese officials from a clinical psychologist that evaluated Rock. The psychologist observed that "[a]s a pastor, director of Catholic scouting for the diocese, assistant director of [y]outh ministry, [Rock] was in a position to use and abuse numerous teenage boys (particularly since 1972)" and that "lately this behavior became more uncontrollable." The letter continued that Rock "is no longer capable of functioning in a responsible work situation, and his life is unmanageable." The

3

psychologist further stated Rock's prognosis is "very poor" and he "must be removed immediately."

In 2018, the Pennsylvania Office of the Attorney General released the report of a Grand Jury investigation of sexual abuse by Catholic priests. The report includes a summary of allegations against Rock. The report states that the Diocese received two reports of abuse by Rock in 1986, after which Rock was placed on "sick leave" and sent to a "treatment center" in New Mexico.

In 2019, plaintiff sued,[3] alleging general negligence, negligent supervision, and negligent hiring and retention that resulted in plaintiff's abuse by Rock. The Diocese moved to dismiss for lack of jurisdiction in May 2020. In December 2021, after delays due to the COVID-19 pandemic, the motion court denied the Diocese's motion without prejudice and ordered discovery on the issue of jurisdiction.

Jurisdictional discovery uncovered certain undisputed contacts that the Diocese had with New Jersey. First, the Diocese transferred three priests to the Dioceses of Trenton and Metuchen in New Jersey in the 1980s and early 1990s.

---

[3] Plaintiff sued pursuant to the Child Victims Act, N.J.S.A. 2A:14-2b(a), which provides a two-year revival window for victims to file otherwise time-barred claims in New Jersey for sexual abuses committed against them while minors.

A-2324-22

One of the transferred priests was later accused of sexual abuse in 2010. Rock was not one of the priests transferred to New Jersey.

Second, two of the three parochial high schools within the Diocese, Bethlehem Catholic and Notre Dame, began enrolling a small number of New Jersey students around 1994 when the Catholic high school in nearby Phillipsburg, New Jersey closed. At the time discovery was conducted, New Jersey students made up approximately 4% and 5.8% respectively of the students enrolled in the schools.

Third, the Diocese entered a contractual relationship with the Healey Education Foundation (Foundation) from 2012 to 2018, a non-profit located in Mount Laurel, New Jersey. The Foundation provided consultant services to schools within the Diocese to assist with improving enrollment, fundraising, and school governance. Foundation meetings and trainings took place in Diocese schools, parishes, or offices. The Diocese mailed payments owed to the Foundation, totaling just over $1,000,000, to New Jersey and engaged in telephone and email exchanges with Foundation consultants in New Jersey. The Diocese also received certain awards from the Foundation that were presented during ceremonies in Philadelphia.

A-2324-22

After jurisdictional discovery, the Diocese renewed its motion to dismiss. The parties appeared before the motion court for oral argument on November 18, 2022. On February 22, 2023, the court issued an order granting the motion accompanied by a written statement of reasons. The court found that even if the Diocese's contacts with New Jersey constituted a purposeful availment of the state's benefits, there lacked any connection or correlation between the contacts and plaintiff's claims. The court further found the facts did "not support a finding of personal jurisdiction based on agency principles and vicarious liability theories."

On appeal, plaintiff argues the court erred by failing to exercise personal jurisdiction because the Diocese purposefully availed itself of the privilege of conducting activities in New Jersey and her cause of action arises from or relates to the Diocese's activities in this state. Plaintiff also argues principles of agency and vicarious liability support the exercise of personal jurisdiction.

II.

Whether New Jersey has specific personal jurisdiction over a foreign defendant is a mixed question of law and fact. Rippon v. Smigel, 449 N.J. Super. 344, 358 (App. Div. 2017). We therefore determine whether the motion court's factual findings "are supported by substantial, credible evidence in the record."

A-2324-22

and review de novo its legal conclusions. Ibid. (citing Mastondrea v. Occidental Hotels Mgmt. S.A., 391 N.J. Super. 261, 268 (App. Div. 2007)).

III.

Plaintiff argues the Diocese is subject to specific personal jurisdiction[4] based on two theories. First, plaintiff argues the Diocese purposefully availed itself of the privilege of conducting activities in New Jersey and that plaintiff's case arises from or relates to the Diocese's contacts in New Jersey. Second, plaintiff argues principles of agency and vicarious liability support New Jersey's exercise of jurisdiction over the Diocese. We address each argument in turn.

A.

"A New Jersey court may exercise in personam jurisdiction over a non-resident defendant 'consistent with due process of law.'" Bayway Refin. Co. v. State Utils., Inc., 333 N.J. Super. 420, 428 (App. Div. 2000) (quoting R. 4:4-4(b)(1)). New Jersey courts "exercise jurisdiction over non[-]resident defendants 'to the uttermost limits permitted by the United States Constitution.'" Jardim v. Overley, 461 N.J. Super. 367, 377 (App. Div. 2019) (quoting Avdel Corp. v. Mecure, 58 N.J. 264 (1971)). Due process dictates that for a forum state to have specific personal jurisdiction over a non-resident defendant, the

---

[4] The parties agree that New Jersey has no general jurisdiction over the Diocese.

defendant must "have certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)); Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322 (1989).

There must be a "relationship among the defendant, the forum, and the litigation" to establish minimum contacts. Lebel, 115 N.J. at 323 (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)). A defendant's conduct must be purposeful and not be caused by the plaintiff's unilateral actions. Ibid. (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98 (1980)). In other words, the contacts "must be the defendant's own choice and not 'random, isolated, or fortuitous.'" Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351, 352 (2021) (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 774 (1984)). We have held "for a state court to exercise [specific] jurisdiction over a non[-]resident defendant, the lawsuit 'must aris[e] out of or relat[e] to the defendant's contacts with the forum.'" Jardim v. Overley, 461 N.J. Super. 367, 376 (App. Div. 2019) (third and fourth alterations in original) (quoting Daimler AG v. Bauman, 571 U.S. 117, 127 (2014)).

Moreover, courts determine, based on the defendant's "'conduct and connection' with the forum state . . . whether the defendant should 'reasonably anticipate being haled into court [in the forum state].'" Bayway Refin. Co., 333 N.J. Super. at 429 (alteration in original) (quoting World-Wide Volkswagen, 444 U.S. at 297). In making that determination, a court "must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." Asahi Metal Indus. Co. v. Superior Ct., 480 U.S. 102, 113 (1987). A court weighs "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." Ibid. (quoting World-Wide Volkswagen, 444 U.S. at 292).

We recently considered the issue of specific jurisdiction in two factually similar cases brought against Catholic Dioceses: D.T. v. Archdiocese of Philadelphia, 477 N.J Super. 370 (App. Div. 2023), leave to appeal granted, 257 N.J. 5 (2024), and Doe 70 v. Diocese of Metuchen, 477 N.J. Super. 270 (App. Div. 2023).

In D.T., plaintiff sued the Archdiocese of Philadelphia alleging one of their priests, Michael McCarthy, sexually abused plaintiff as a child. D.T., 477 N.J. Super. at 376. Plaintiff alleged McCarthy drove plaintiff to a home in

Margate, where McCarthy assaulted him.  Id. at 378.  The trial court dismissed plaintiff's claims for lack of personal jurisdiction.  Id. at 376.  The record reflected the Archdiocese once owned properties in Ventnor, New Jersey, which were sold in 2012 and 2013.  Id. at 377.  We affirmed, finding "no evidence that the Archdiocese's former ownership of real properties in New Jersey had any relation to plaintiff's allegation of abuse by McCarthy."  Id. at 384.

In Doe 70, plaintiff sued the Diocese of Metuchen and the Diocese of Richmond, Virginia, alleging one of Richmond's priests, John Butler, sexually abused plaintiff from 1995 to 1998 while Butler was serving at a parish in New Jersey.  477 N.J. Super. at 275, 278.  The record supported that Richmond became aware of Butler's abuse of children in the 1960s, and in 1970 encouraged Butler to go to a New Jersey parish for a "fresh start."  Id. at 277-78.  The trial court found Richmond was subject to specific personal jurisdiction, and we affirmed, agreeing that plaintiff's claims arose "out of Richmond's deliberate and intentional actions to allow Butler to serve as a priest in New Jersey.  Butler was not in New Jersey because of his unilateral actions."  Id. at 284.

In the case before us, while plaintiff may have established sufficient "minimum contacts" through defendant's contractual relationship with a New Jersey foundation, the enrollment of New Jersey students in parochial schools,

10

and the transfer of priests to New Jersey dioceses, plaintiff has not shown her claims arise out of or relate to these contacts. See Jardim, 461 N.J. Super. at 376. Plaintiff emphasizes defendant's transfer of three priests to New Jersey in 1980s.[5] However, Rock was not one of the priests transferred, and was never alleged to be in New Jersey in his official capacity as a priest for the Diocese. Plaintiff was also not connected to any parochial school or education program sponsored by the Diocese. Rather, Rock met plaintiff, whose parents he was already friendly with, while he was in New Jersey on his own accord. There are no facts in the record to support the proposition that the Diocese knew of or sanctioned Rock's visits to New Jersey to gain access to plaintiff. Additionally, while plaintiff argues the record supports "as of at least 1985 but likely as far back as 1972, Rock was known to the Diocese to have committed sexual abuse of minor children," the record does not support the Diocese knew of Rock's abuse before 1985.

---

[5] Plaintiff notes that one of the transferred priests was later accused of sexual abuse. However, the record reflects that the Diocese's earliest knowledge of accusations against this priest dates to 2010. The record does not show that the Diocese purposefully transferred a priest known to have abused children to New Jersey. The record suggests this priest, and the other priests transferred were sent in response to a request by the Diocese of Trenton due to a shortage of priests, and not a desire to proactively remove problematic priests.

The facts of this case are more analogous to <u>D.T.</u> than <u>Doe 70</u>. In <u>D.T.</u>, the Archdiocese owned properties in New Jersey, but the properties were not connected in any way to the abuse that occurred. 477 N.J. Super. at 384-85. In this case, defendant had transferred priests to New Jersey, but Rock was not one of them, and there is no evidence that Rock was ever in New Jersey for any official assignment or church business. Rather, Rock was in New Jersey of his own accord. The facts here are clearly distinguishable from <u>Doe 70</u>, where the defendant was aware of the abuser's propensities and encouraged and permitted him to seek a position in New Jersey and as such "was not in New Jersey because of his unilateral actions." 477 N.J. Super. at 284.

There is no obvious connection between defendant's contacts in the state and plaintiff's claims. Defendant's transfer of priests to New Jersey may cause them to "reasonably anticipate being haled into court," <u>Bayway Refin. Co.</u>, 333 N.J. Super. at, 429 (quoting <u>World-Wide Volkswagen</u>, 444 U.S. at 297), to answer for the actions of priests it sends to New Jersey on church business. However, extending jurisdiction over the Diocese for the actions of any priest who unilaterally travels to and commits torts in New Jersey would "offend 'traditional notions of fair play and substantial justice.'" <u>Int'l Shoe Co.</u>, 326 U.S. at 316 (quoting <u>Milliken</u>, 311 U.S. at 463).

12

Plaintiff's argument that the trial court erred by applying a strict "causation-only" theory in determining whether the claim arises out of or relates to defendant's contacts is without merit. Plaintiff argues the Unted States Supreme Court's decision in <u>Ford Motor Co.</u> explicitly rejected a causation-only approach to the minimum contacts analysis. The Court held:

> None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do. As just noted, our most common formulation of the rule demands that the suit "arise out of <u>or relate to</u> the defendant's contacts with the forum." The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing. <u>That does not mean anything goes. In the sphere of specific jurisdiction, the phrase "relate to" incorporates real limits, as it must to adequately protect defendants foreign to a forum</u>. But again, we have never framed the specific jurisdiction inquiry as always requiring proof of causation—i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct.
>
> [592 U.S. at 362 (citations omitted) (second emphasis added).]

We disagree with plaintiff's argument, and conclude finding no personal jurisdiction does not rely on a causation only approach contrary to <u>Ford Motor Co</u>. Nothing in the record suggests that Rock was officially designated or assigned to travel, minister, or conduct other Diocese business in New Jersey.

A-2324-22

It follows that this case is beyond the "real limits" of the phrase "relates to," as there is no real relation between plaintiff's claims and defendant's contacts in New Jersey.

B.

We consider plaintiff's argument that principles of agency and New Jersey law on vicarious liability support the exercise of jurisdiction over defendant through the actions of Rock as an agent of the Diocese. Plaintiff argues that Rock was entering and acting in New Jersey to fulfill his obligations as a priest for the Diocese, establishing minimum contacts sufficient for specific personal jurisdiction.

We have noted that "determining personal jurisdiction is a separate question from determining vicarious liability." D.T., 477 N.J. Super. at 385 (citing Ford, 592 U.S. at 361). "Nevertheless, the authorized acts of an agent can establish personal jurisdiction over the principal." Id. at 385-86 (citing Daimler, 571 U.S. at 135 n.13). "To hold a principal vicariously liable for an agent's tortious conduct, the agent must be acting within the scope of his or her employment and responsibilities." Id. at 386 (citing Haviland v. Lourdes Med. Ctr. of Burlington Cnty., Inc., 250 N.J. 368, 378 (2022)). "An employee is acting within the scope of employment if the action is 'of the kind'" that the

employee is hired to perform; "it occurs substantially within the authorized time and space limits;" and "it is actuated, at least in part, by a purpose to serve the [employer]." Ibid. (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 416 (1994)).

We have previously rejected the theory of personal jurisdiction established through agency. In D.T., we found:

> McCarthy was not acting within the scope of his responsibilities as a priest when he sexually assaulted plaintiff. . . . Further, there is no evidence that the Archdiocese delegated to McCarthy the authority to control plaintiff by counseling and ministering to plaintiff in his private home in New Jersey. Instead, the facts establish that plaintiff's mother gave McCarthy permission to take plaintiff to the home in Margate.
>
> [477 N.J. Super. at 387.]

Here, the motion court properly found that Rock's actions were outside the scope of his duties as a priest and are not a basis for personal jurisdiction. The motion court's finding "there is no evidence of Diocese business operations or property ownership in New Jersey during the period that [p]laintiff's abuse began" is supported by the record. Further, no evidence supports that Rock was acting within the scope of his responsibility as a priest when he sexually abused plaintiff. Rather, as the trial court found, "Rock's 'friendship' with . . . [p]laintiff's family constitutes a random, fortuitous, or attenuated contact

between the Diocese and [p]laintiff that the law does not recognize as sufficient to subject the Diocese to personal jurisdiction in New Jersey." As such, we conclude the reasoning and holding we articulated in <u>D.T.</u> applies to this record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2324-22