942 A.2d 29 (2008)
398 N.J. Super. 313
Paul DOLAN and Kathleen Dolan, his wife, Plaintiffs-Respondents,
v.
SEA TRANSFER CORP., Jose E. Gonzalez, Howland Hook Container Terminal, Inc., Hapag-Lloyd (America), Inc., Defendants, and
Hapag-Lloyd, A.G., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 17, 2007.
Decided February 20, 2008.
*31 Stacy Alison Fols, Cherry Hill, argued the cause for appellant (Montgomery, McCracken, Walker & Rhoads, L.L.P., attorneys; Ms. Fols, John J. Levy, and Sarah E. Zuba, on the brief).
Richard J. Weiner and Raymond S. Carroll, Montvale, argued the cause for respondents (Weiner, Carroll & Strauss, attorneys; Mr. Weiner and Mr. Carroll, on the brief).
Before Judges S.L. REISNER, GILROY and BAXTER.
The opinion of the court was delivered by
S.L. REISNER, J.A.D.
Defendant Hapag-Lloyd AG (H-L) appeals from a trial court order dated September 16, 2005, applying New York law to defendant's potential liability in this personal injury case; an order dated September 28, 2006, entering judgment on a jury verdict in favor of plaintiffs Paul Dolan and his wife Kathleen Dolan; and an October 18, 2006 order denying defendant's motion for a new trial. We affirm.

I
This case concerns a January 2, 2004 accident which occurred on Route 46 in Palisades Park, New Jersey, between a car driven by plaintiff Paul Dolan (Dolan) and a container that fell off a tractor-trailer. The tractor-trailer (truck) was composed of a chassis and an intermodal container belonging to H-L, an ocean carrier, and a cab belonging to Sea Transfer Corp., a motor carrier.[1] The Sea Transfer truck *32 was transporting H-L's cargo from the Howland Hook terminal in Staten Island to H-L's customer in the Bronx.
The most direct delivery route would have been to drive entirely through New York. However, at the direction of his employer Sea Transfer, the driver Jose Gonzalez drove a portion of the trip through New Jersey in order to avoid New York City traffic. His prescribed route involved taking the Goethals Bridge to the New Jersey Turnpike, to Route 46, to the George Washington Bridge.[2]
In granting a motion for summary judgment on the issue of the driver's negligence, the trial judge concluded that the accident occurred because Gonzalez failed to properly secure the container to the truck chassis before he left the Staten Island terminal. Instead, knowing that the two front locking pins on the chassis were not properly inserted in the container, Gonzalez chose to drive the truck anyway, skipping the optional "roadability" inspection on his way out of the terminal. Roadability inspections are done to "ensure that the unit is roadworthy to be taken out on public streets."
As he was driving east on Route 46, a divided highway with two lanes in each direction, Gonzalez moved his truck so that it occupied both northbound lanes, to anticipate the possibility of drivers merging onto Route 46 from the side. According to the judge's written opinion, Gonzalez "proceeded around a curve in the road, and as he started to move back into the right lane, the container became dislodged from the chassis and fell over the divider into the Westbound lane of traffic of Route 46."[3] In addition, the chassis itself separated from the truck cab and slid over the divider.
Dolan, a plumber employed by the City University of New York (CCNY) at 138th Street in Manhattan, was on his way home from work.[4] He followed his usual route across the George Washington Bridge into New Jersey, and then onto Route 46, heading for the New Jersey Turnpike. However, as Dolan's minivan was proceeding westbound on Route 46, it collided head-on with the container that had fallen off Gonzalez's truck. The front of Dolan's vehicle was virtually destroyed. The investigating officer on the scene testified that he had "never seen damage like that to a vehicle and somebody surviving." Dolan sustained massive injuries which, according to his expert witnesses, resulted in his total disability.
Plaintiffs first filed suit in New York. However, the New York judge dismissed *33 the action solely on forum non conveniens grounds. The judge declined to decide whether New York or New Jersey law would apply to the underlying controversy, and in fact noted that "any New Jersey Court may apply New York law where warranted."
In granting plaintiffs' motion to apply New York law to the issue of H-L's liability, the New Jersey trial judge reasoned that the negligent act which was at the root of the accident occurred in New York, when Gonzalez, a New York resident and employee, operating a truck based in New York, failed to properly attach the container to the chassis. That the accident occurred in New Jersey was a fortuitous. circumstance. ("Everything that occurred here occurred in New York but the happening of the accident itself.")
The jury returned the following verdict for Paul Dolan: $8 million for pain and suffering, $150,000 for past medical expenses, $138,000 for past lost wages, and $914,000 for future lost wages. The jury awarded Kathleen Dolan $2 million for loss of consortium.
In ruling on defendant's motion for a new trial, the judge reasoned that the verdict was not a miscarriage of justice. "The injuries which this gentleman suffered were unimaginable. . . . [T]he medical testimony was overwhelming that this gentleman, but for the grace of God, probably should be dead and not alive. There wasn't any doubt in my mind, and obviously there was no doubt in the jury's mind that this gentleman is totally disabled, and that he is going to suffer because of these enormous injuries for the rest of his life."

II
The case presents two issues. The first is the applicability, under choice-of-law principles, of New York law, which imposes vicarious liability on the owner of a motor vehicle for the negligence of a permissive user of the vehicle. See N.Y. Vehicle and Traffic Law § 388(1).[5] There is no issue in this case that in New York, an entity such as H-L that requires a driver to use its chassis and other motor vehicle equipment is subject to § 388. At oral argument, defendant's counsel agreed that if this accident had occurred in New York (i.e., if it were an undisputed "New York accident"), H-L would be vicariously liable for the negligence of the driver. New Jersey law, on the other hand, does not impose liability on the owner of a motor vehicle for the negligence of a permissive user who is not the owner's agent. See Fu v. Fu, 160 N.J. 108, 118, 733 A.2d 1133 (1999).
The second issue is whether the trial judge should have granted H-L a new trial based on an improper comment by plaintiffs' counsel about H-L's "negligence," and certain inappropriate references to specific amounts of money to be used in calculating damages for pain and suffering.

III
A. The Choice-of-Law Issue
Our review of the trial court's ruling on the choice-of-law issue is de novo. *34 Mastondrea v. Occidental Hotels Management, 391 N.J.Super. 261, 283, 918 A.2d 27 (App.Div.2007). We thus turn to the applicable law on that issue.
As our Supreme Court most recently confirmed in Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 917 A.2d 767 (2007), in deciding choice-of-law issues in tort cases, our courts apply a governmental interest test, rather than simply considering the location of the injury:
When law suits are filed in New Jersey, we apply our choice-of law rules. In tort suits, such as this one, we no longer mechanistically apply the law of the place of wrong. Instead, we currently subscribe to the more flexible governmental-interests analysis.
In applying the governmental-interests analysis, two steps are involved. "The first step in the analysis is to determine whether a conflict exists between the laws of the interested states. Any such conflict is to be determined on an issue-by-issue basis." . . .
If there is an actual conflict, the second step "seeks to determine the interest that each state has in resolving the specific issue in dispute." The Court must "identify the governmental policies underlying the law of each state" and determine whether "those policies are affected by each state's contacts to the litigation and to the parties." We must apply the law of "the state with the greatest interest in governing the particular issue."
[Id. at 621-22, 917 A.2d 767 (citations omitted).]
Looking to this well-established precedent, we readily conclude that there is a conflict between New York law and New Jersey law, on the issue of a vehicle owner's vicarious liability for the negligence of a permissive user. Thus, we consider the purposes behind the laws of the two states.
In Fu v. Fu, supra, a case involving New Jersey residents who were injured when their rented car went off the road in New York, our Court considered the purposes of the two States' laws. Although the accident involved a car rented in New Jersey by New Jersey residents, the court concluded that New York's policy interest predominated. After reviewing the history of § 388, the Court concluded that its purpose was not only to ensure sufficient insurance coverage for injured accident victims, but also to influence the behavior of vehicle owners based in New York or whose cars are brought into New York:
New York has a well-articulated, twofold policy underlying Section 388. First, the statute was designed to "ensure access by injured persons to a financially responsible insured person against whom to recover for injuries." Section 388 achieves that compensatory purpose by "remov[ing] the hardship which the common-law rule visited upon innocent persons by preventing an owner from escaping liability" because of the lack of an employment or agency relationship with the driver. Although New York's compensatory purpose is especially strong when the victim is a New Yorker, the "innocent victim class has not been limited to New Yorkers." . . .
In enacting Section 388 New York also intended to regulate the conduct of automobile owners by "discourag[ing] owners from lending their vehicles to incompetent or irresponsible drivers . . . Section 388 was intended to operate "as an incentive to lessors of motor vehicles to lease only to competent individuals."
[Fu, supra, 160 N.J. at 119-120, 733 A.2d 1133 (citations omitted).]
The Court emphasized the New York Legislature's interest in promoting safety:

*35 We also reject the lower courts' characterization of Section 388 as a "loss-allocating" rule with no deterrent purpose. Although vicarious liability rules, broadly defined, serve a loss-allocating function, there is no question that from its inception Section 388 also was intended to regulate irresponsible car lending practices, and it is that underlying governmental purpose that guides our inquiry. That the rule regulates highway safety indirectly, by providing an incentive for responsible business practices, rather than directly by stating a "rule of the road" is irrelevant to the strength of New York's policy.
[Id. at 138, 733 A.2d 1133.]
On the other hand, New Jersey's common law policy was designed to protect vehicle owners from liability without fault. Quoting Haggerty v. Cedeno, 279 N.J.Super. 607, 653 A.2d 1166 (App.Div.), certif. denied, 141 N.J. 98, 660 A.2d 1197 (1995), the Fu Court reasoned:
The policy supporting New Jersey's common-law vicarious liability law was described in Haggerty, supra, 279 N.J.Super. at 611-12, 653 A.2d 1166:
New Jersey's common law rule regarding owner liability is not designed to protect the injured party . . . or to protect the driver. It is designed to shield an owner from liability in cases in which the owner has not been negligent and in which the culpable driver is not related to the owner in a way that will justify the imposition of vicarious liability under traditional principles of the law of agency or master servant. That shield is consistent with the principle that tort liability in the context of automobile-related personal injuries is based on fault.
New Jersey's rule serves neither a deterrent nor a compensatory purpose. Rather, it simply adheres to the well-established, common-law principle that liability for automobile negligence should be allocated solely on the basis of fault.

[Fu, supra, 160 N.J. at 120-21, 733 A.2d 1133.]
The Court noted, however, that the purpose of New Jersey's law had been ameliorated somewhat by the passage of the "No-Fault" insurance law, adopted to provide medical benefits to injured accident victims regardless of fault:
. . . . N.J.S.A. 39:6B-1, the mandatory insurance law, requires this State's individual automobile owners to carry insurance coverage consistent with requirements imposed by the Commissioner of Insurance that includes the obligation to provide coverage for liability arising out of the permissive use of their vehicles. That requirement obviously reflects a legislative purpose to ameliorate the effect of New Jersey's common-law rule against vicarious liability by requiring car owners to pay the cost of liability coverage for permissive users to assure that compensation is available for their injured victims. Insofar as N.J.S.A. 39:6B-1 aims to effectuate the overriding legislative policy of assuring financial protection for the innocent victims of motor vehicle accidents, in part by requiring coverage for injuries arising out of permissive automobile use, that policy would appear to be congruent with New York's direct imposition of vicarious liability on automobile owners arising out of the negligent permissive use of their vehicles. [Id. at 121-22, 733 A.2d 1133 (emphasis added).]
After determining each state's policy interest, the Fu Court next considered whether those policy concerns would be furthered by applying that state's law in *36 the multi-state context. Id. at 122, 733 A.2d 1133. In a tort case, the relevant factors to be considered are "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Ibid.
With respect to comity, we must consider whether applying New Jersey law would frustrate the policies of New York and vice versa. Ibid. "If a strong state policy or interest will be neither fostered by applying that state's law, nor frustrated by the failure to apply it, it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law." Ibid. These principles must be applied on a case-by-case basis. Ibid.
In considering the states' competing interests, the court must also consider how the policy of each state's laws relate to the parties' contacts with that state. Id. at 125, 733 A.2d 1133. Thus, we consider the quality and quantity of the contacts:
Section 145(2) of the Restatement [(Second) of Conflict of Laws (1971)] specifies the contacts that are most significant to that analysis: the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered. Those contacts are "considered, however, only to the extent that they are relevant to the purposes of the particular laws in conflict."
. . . .
In personal injury cases, "the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law." When both conduct and injury occur in a single jurisdiction, with only "rare exceptions, the local law of the state where conduct and injury occurred will be applied" to determine an actor's liability. That is so because "a state has an obvious interest in regulating the conduct of persons within its territory and in providing redress for injuries that occurred there." [Id. at 125-26, 733 A.2d 1133 (citations omitted).]
In Fu, the Court concluded that New York had the dominant interest in the application of its law to the liability issue, because the act of negligence and the injury occurred in New York, the rental car company could have foreseen and insured against the car being driven in New York, and applying New York's law would "further the goals of deterrence and compensation." Id. at 136-37, 733 A.2d 1133.
We next consider Haggerty v. Cedeno, supra, a case cited with approval in Fu. In Haggerty, we applied New York law to an accident that occurred in New Jersey, when a New. Jersey resident was struck by a car that had been leased in New Jersey but was registered in New York and owned by a New York corporation. Noting the purpose of § 388 to promote safety as well as to ensure recovery for accident victims, we reviewed the history of the law's extraterritorial application. We concluded that the car owner could have anticipated, and insured against, the application of New York law and that it was merely fortuitous that the accident had occurred in New Jersey; moreover, this State had no strong interest in applying its law to the detriment of its resident:
New Jersey's interest in adhering to fault-based owner's liability is substantially diluted where, as in the present *37 case, the owner is not a New Jersey resident, has its principal place of business in New York, the vehicle is registered in New York, and New York has determined that its vehicle owners shall be liable for the negligence of persons operating their automobiles.
Expressed in terms of the governmental interest analysis . . . New Jersey's contact with the vehicle and its owners was fortuitous and, therefore, New Jersey has; at best, a weak interest in providing the protection of its rule to Dollar [the defendant car rental company]. On the other hand, New York's contacts with the owner and the vehicle are substantial and directly related to the purpose of § 388, as recognized . . . in New York's legislative history.
An owner registering a vehicle in New York is on notice regarding its liability exposure for the torts of persons who are permitted to operate the vehicle and is required to insure the vehicle consonant with that exposure. Thus, New York, as the vehicle's home state, occupies a unique and critical position for the regulation of the owner's legal obligations arising out of the ownership and use of the vehicle. . . . New Jersey's contact with the vehicle and its ownership was fleeting and tenuous compared with New York's contacts. New Jersey, therefore, has little interest in protecting Dollar when New York withholds that protection.
[Id. at 612, 653 A.2d 1166 (citations omitted)]
In Erny v. Estate of Merola, 171 N.J. 86, 792 A.2d 1208 (2002), the Court likewise applied New York law to determine the issue of joint and several liability where the accident occurred in New Jersey, but the two defendant drivers were New York residents driving vehicles insured in New York. Id. at 91, 792 A.2d 1208. The defendant with the higher insurance limit was found forty percent liable and under New Jersey law would pay only forty percent of the badly-injured plaintiffs damages. Applying New Jersey law would have prevented the plaintiff from recovering fully for her, injuries, while applying New York law would have required the defendant with the higher policy limit to pay the entire verdict. Id. at 92-93, 792 A.2d 1208.
The Court recognized New York's legislative policies to ensure full recovery for injured accident victims and to encourage safe driving, as opposed to New Jersey's policy of limiting the liability of defendants in order to keep insurance premiums down. Id. at 106-07, 792 A.2d 1208. Since both drivers were from New York and were driving cars insured in New York, the Court concluded that New York had the stronger policy interest in applying its law, and that New Jersey had little or no interest in applying its law. Id. at 107-08, 792 A.2d 1208. Consequently, although the locations of the injury and the negligent conduct are frequently the controlling factors for choice-of-law purposes, the Erny Court concluded they were not controlling under the factual circumstances of that case.
Because the policy underlying New Jersey's law is not thwarted by application of New York joint and several liability laws to this case, and because the compensation and deterrence policies underlying New York's law are advanced, the Restatement's presumption in favor of the law of the situs of the conduct and injury is overcome.
[Id. at 108, 792 A.2d 1208 (citing Restatement (Second) of Conflict of Laws §§ 145 and 146 (1971))]
Applying the well-established law we have described, we agree with the trial judge's decision to apply New York law to *38 this accident. In this case, the primary act of negligence occurred in New York, when Gonzalez knowingly failed to ensure that the container was properly attached to the chassis and intentionally evaded the optional roadability inspection at the Staten Island terminal. Once he left the terminal with the improperly-secured container, his tractor-trailer was an accident waiting to happen. Further, he was engaged in a New York transaction, in which H-L's container was unloaded in New York, and was placed on H-L's chassis in " New York, to be transported to another location in New York. Thus, "there is a reasonable relationship between [H-L]" and the state whose vicarious liability law is to be applied. Fu v. Fu, supra, 160 N.J. at 127, 733 A.2d 1133 (citing Restatement (Second) of Conflict of Laws § 174 (1971)).
All of the activity within New York strongly implicated New York's legislative policy to encourage vehicle owners to do more to ensure safety on the road. In that connection, we note that § 388 specifically applies vicarious liability to the owner of a container, chassis or other equipment that is part of a tractor-trailer. Thus, we may fairly infer a legislative intent to encourage such owners to guard against the very type of accident that occurred here. For example, while we imply no negligence on H-L's part, H-L had a well-organized ongoing contractual relationship with Sea Transfer and might have required that its vehicles be subjected to mandatory roadability inspections before leaving the terminal. Moreover, because H-L's containers were offloaded in New York and placed on H-L's chassis, and thus would necessarily be driven in New York, H-L was on notice that it was subject to New York's vicarious liability law, § 388, and hence it could insure against that potential liability. See Fu, supra, 160 N.J. at 135-36, 733 A.2d 1133.
We also conclude that the accident's occurrence in New Jersey was fortuitous. While Gonzalez, a New York resident and employee, detoured through New Jersey to avoid New York City traffic, he was headed for the Bronx. The accident could as easily have occurred in New York as in New Jersey. Although Dolan was a New Jersey resident, he had been employed at CCNY in New York for many years. He was on his way home from New York at the time of the accident, taking the reverse route that Gonzalez was following. Not only could the accident have happened in New York, but it could well have happened in New York between these same two parties. As a New York employee, Dolan was well within the universe of persons whose safety the New York law was aimed at protecting. Further, the accident had some impact in New York, as, according to his testimony, Dolan received some sick-leave pay from CCNY, and his devastating injuries deprived CCNY of a long-term employee.
While we cannot make a choice-of-law determination simply to ensure a recovery for the plaintiff, Haggerty, supra, 279 N.J.Super. at 612, 653 A.2d 1166, in this case applying New York law serves that State's legislative purpose to ensure a sufficient recovery of damages for a badly injured accident victim. New Jersey's interest in applying its policy of equating liability with fault, does not outweigh New York's policy to encourage traffic safety and ensure an adequate recovery for accident victims. See Fu, supra, 160 N.J. at 136-137, 733 A.2d 1133.
Nor does the fact that H-L has its principal offices in New Jersey change the result. H-L has not "justifiably relied on the shelter afforded by New Jersey law," id. at 123, 733 A.2d 1133, with respect to this accident. We find much more significance *39 in H-L's ongoing business which was being carried out on a daily basis in New York, albeit with equipment registered in Maine and insured elsewhere. Gonzalez's negligence in failing to properly attach the container, which negligence occurred in New York, arose in the context of H-L's business relationships with Sea Transfer and the Howland Hook terminal in New York. That is where the H-L containers and the motor vehicle equipment were located, and that is where H-L could be influenced to cooperate with New York's strong policy to ensure safety on its roads.[6]
For all of these reasons, we conclude that the trial court properly applied New York law to determine H-L's liability for the accident. To the extent it might be relevant, we would reach the same conclusion with respect to New York's law on joint and several liability. Imposing liability on H-L will have no effect on New Jersey insurance rates, and it will further the policy of New York's tort laws to protect innocent accident victims and encourage traffic safety. See Erny, supra, 171 N.J. at 104-07, 792 A.2d 1208.
B. Claimed Trial Errors
Defendant contends that the trial court erred in denying H-L's motion for a new trial. Such a motion is not to be granted unless the trial judge determines, after giving due regard to the Jury's opportunity to judge witness credibility, that the verdict represents a miscarriage of justice. R. 4:49-1(a). See Caldwell v. Haynes, 136 N.J. 422, 431, 643 A.2d 564 (1994). We apply a deferential standard on appeal:
A trial court's ruling denying defendant's motion for a new trial will not be disturbed unless it clearly appears that there was a miscarriage of justice under the law. Where the issue does not involve *40 the trial court's fact-finding role, but rather its exercise of discretion, the appellate court will not interfere unless the trial judge has "pursue[d] a manifestly unjust course." So, too, a decision to grant or deny a motion for a mistrial will not be reversed unless there is a showing of a mistaken exercise of discretion.

[Diakamopoulos v. Monmouth Med. Ctr., 312 N.J.Super. 20, 36-37, 711 A.2d 321 (App.Div.1998) (citations omitted).]
We find no error in the trial judge's decision to deny H-L's motion for a new trial. During his opening statement, plaintiffs' counsel made a brief reference to the value of plaintiffs' injuries: "Now, ladies and gentlemen, you will need to determine, what is that pain worth? Would you take $20 an hour for that pain? Is that worth S500 a day for the rest of one's life?" At this point defense counsel objected that "[i]t's getting argumentative" and plaintiffs' counsel withdrew his remark. In his opening remarks, defense counsel told the jury that plaintiffs' counsel had "suggested some numbers. That was improper, and he withdrew his suggestion of numbers. You can't do that. That's your decision as to what the numbers are." He later stated that "we can't tell you a number. We can't suggest a number to you."
After the openings, defense counsel did not request a mistrial based on plaintiff counsel's remark. Instead he noted to the trial judge that what he wanted "mostly is an instruction that [counsel] won't do that again." Plaintiffs' counsel apologized and promised not to repeat the, error. With the agreement of both counsel, the trial judge reminded the jury that they should ignore any arguments made in either counsel's opening statements, because those statements were only intended to "give you an overview of what the case is all about." The judge had previously instructed the jurors that the attorneys' opening statements were not evidence. Further, because of plaintiff counsel's inappropriate remarks in his opening statement, the judge precluded him from referring to the time-unit rule in his closing argument. See R. 1:7-1(b).
Throughout the trial, the judge maintained strict control over the proceedings to avoid error. For example, after the jury heard emotional testimony from a witness to the accident, who was clearly shaken by what he had seen, the judge strongly admonished the jury not to decide the case based on sympathy or emotion.
In the beginning of his summation, plaintiffs' counsel stated that H-L "is being asked to pay damages for issues involving their negligence." The' trial judge sustained defense counsel's immediate objection and directed the jury to "disregard the last comment by the plaintiffs['] attorney." When plaintiffs' counsel responded that "[t]hey have been found liable by the court, as a matter of law," the judge sustained another defense objection and directed that "[t]he jury will disregard that comment as well."
Later in the summation, plaintiffs' counsel stated that "if you take the 1.4 million that Marcus [plaintiffs economic loss expert] put down, then I suggest to you that the amount of pain and damages is  is significantly more. That is just one piece of it." Defense counsel immediately objected and suggested that he was "tempted to ask for a mistrial." However, he did not ask for a mistrial or request a curative instruction. The judge "reserved," noting that plaintiffs' counsel may not have realized what he was saying. In charging the jury, the trial judge reminded them that "[t]he law does not provide you with any table, with any schedule, with any formula by which a person's pain and suffering . . . may be measured in terms of money."
*41 We have read the entire record, which fairly depicts plaintiffs extensive injuries, his terrible physical suffering, which was continuing as of the trial in 2006 and was projected to continue indefinitely, his permanent physical impairment, his past and future surgeries, and his psychiatric damage. Dolan and his wife painted a compelling picture of the accident's disastrous consequences to their everyday lives. Yet, none of the testimony was over-dramatized or sensationalized, and the defense did not even cross-examine the witnesses on these issues. The jury evidently found plaintiffs' witnesses credible. Moreover, the fact that the jury awarded Dolan less in economic damages than plaintiffs' expert recommended, suggests to us that the jury viewed the evidence objectively and was not unduly influenced by counsel's improper comments.
The verdict is not excessive or shocking to the conscience. See Baxter v. Fairmont Food, 74 N.J. 588, 603-04, 379 A.2d 225 (1977). We cannot conclude that the verdict resulted from plaintiffs' counsel's fleeting albeit highly improper attempts to quantify Dolan's pain and suffering damages, or his equally brief reference to H-L's negligence. This ease in no way resembles Geler v. Akawie, 358 N.J.Super. 437, 465-72, 818 A.2d 402 (App.Div.), certif. denied, 177 N.J. 223, 827 A.2d 290 (2003), where significant improprieties by plaintiffs counsel warranted a new trial, or Henker v. Preybylowski, 216 N.J.Super. 513, 520, 524 A.2d 455 (App.Div.1987), where the jury returned an excessive verdict, probably attributable to counsel's improper comments as to which the court, issued no limiting instructions. Defense counsel here did not request a mistrial and was satisfied with the judge's curative instructions. See R. 1:7-2. Defendant cannot now seek to upset an otherwise fair verdict absent plain error, which is not present' in this record. See R. 2:10-2.
Affirmed.
NOTES
[1] Pursuant to a Uniform Intermodal Interchange and Facilities Access Agreement, Sea Transfer agreed to provide insurance coverage and to indemnify H-L against claims for bodily injury arising out of its use of H-L's equipment. Sea Transfer had $1 million in coverage. There are no documents in the record concerning H-L's insurance coverage, but counsel indicated on the record in the trial court that H-L had $25 million in coverage.
[2] In the record presented to us, Gonzalez did not specifically testify that he took the George Washington Bridge, although counsel represented that he did. However, we take judicial notice that there is no other Hudson River crossing he would have taken to reach the Bronx from Route 46.
[3] The record includes photographs of the accident scene. It is clear from the photos that even if the truck driver's action in occupying both lanes was negligent with respect to other eastbound drivers, it had nothing to do with this accident. There is no evidence that he changed lanes precipitously or that trucks were not allowed in the left lane. Dolan's car was on the other side of the divided highway. The record supports the trial judge's conclusion that the accident was caused by Gonzalez's failure to secure the H-L container to the H-L chassis before he left New York, which in turn allowed the container to fall off the truck into Dolan's lane of travel. H-L has not appealed from the November 10, 2005 order granting summary judgment on the issue of the truck driver's negligence.
[4] Dolan worked at CCNY from 8:00 a.m. to 3:30 p.m. The accident occurred at or slightly before 4:00 p.m.
[5] This statute provides:

Every owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner.
Whenever any vehicles as hereinafter defined shall be used in combination with one another, by attachment or tow, the person using or operating any one vehicle shall, for the purposes of this section, be deemed to be using or operating each vehicle in the combination, and the owners thereof shall be jointly and severally liable hereunder.
[Ibid. (emphasis added).]
[6] These facts distinguish this case from Kim v. Paccar Financial Corp., 385 N.J.Super. 142, 896 A.2d 489 (App.Div.), certif denied, 188 N.J. 219, 902 A.2d 1236 (2006), on which H-L relies. In Kim, the defendant driver's negligence occurred entirely within New Jersey, and we were not able to identify any way in which applying New York law would further that State's legislative policies. Id. at 150-51, 896 A.2d 489. Likewise, unlike Arias v. Figueroa, 395 N.J.Super. 623, 631, 930 A.2d 472 (App.Div.2007), certif. denied, 193 N.J. 223, 936 A.2d 969 (2007), the accident here arose, to a substantial extent, from negligence in "the use and operation" of the tractor trailer in New York, see § 388, although the crash itself happened in New Jersey. While we disagree with Arias that New York's law was not intended to have extraterritorial application, see Haggerty, supra, 279 N.J.Super. at 610, 653 A.2d 1166, we need not pursue that issue in detail here due to the significant differences in the facts between this case and Arias. See Budget Rent-A-Car Sys., Inc. v. Chappell, 407 F.3d 166, 170-71 (3rd Cir. 2005)("It is beyond dispute that § 388(1) has extraterritorial scope, that is, it can apply to accidents occurring beyond New York's borders."), cert. denied, 546 U.S. 978, 126 S.Ct. 567, 163 L.Ed.2d 463 (2005); King v. Car Rentals, Inc., 29 A.D.3d 205, 813 N.Y.S.2d 448, 456 (2006)("[P]rier use of a vehicle to any degree within the state is sufficient to establish the applicability of Vehicle and Traffic Law § 388.")

We decline to follow cases, such as Buglioli v. Enterprise Rent-A-Car, 811 F.Supp. 105 (E.D.N.Y.), aff'd, 999 F.2d 536 (2d Cir.1993), where the court employed New York's choice-of-law rules. Since the accident occurred in New Jersey we apply this State's law concerning choice-of-law. See Fu, supra, 160 N.J. at 117, 733 A.2d 1133. We also conclude that none of the other New York and Federal cases H-L cites are on point with this case, because they involved vehicles, litigants and/or accidents, that had no connection to New York. See e.g., J.B. Dorsey v. Yantambwe, 276 A.D.2d 108, 715 N.Y.S.2d 566 (2000), lv. denied, 96 N.Y.2d 712, 729 N.Y.S.2d 439, 754 N.E.2d 199 (2001)(The accident occurred in New York, but the tortfeasor's car was rented in the District of Columbia, and none of the accident participants were New York residents).