NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1573-14T1

LORRAINE SHERIDAN,
Individually and as
Administratrix of the
ESTATE OF JAMES SHERIDAN
and Administratrix ad
Prosequendum of ESTATE OF
JAMES SHERIDAN,

 Plaintiff-Appellant,

v.

DR. FREDERIC LEHMAN,

 Defendant-Respondent,

and

COMMUNITY MEDICAL CENTER,

 Defendant.

 Argued December 13, 2016 – Decided February 13, 2017

 Before Judges Reisner, Koblitz and Rothstadt.

 On appeal from the Superior Court of New
 Jersey, Law Division, Ocean County, Docket No.
 L-1913-11.

 G. John Germann argued the cause for appellant
 (DeNoia Tambasco & Germann, attorneys; Thomas
 DeNoia, of counsel; Mr. Germann, on the
 brief).
 Hugh P. Francis argued the cause for
 respondent (Francis & Berry, attorneys; Mr.
 Francis, of counsel; Mr. Francis and Joanna
 Huc, on the brief).

PER CURIAM

 Lorraine Sheridan (plaintiff), individually and as

administratrix of the estate of her husband, James Sheridan

(Sheridan), appeals from an August 8, 2014 order dismissing the

complaint based on a no-cause jury verdict in her medical

malpractice lawsuit.

 Sheridan committed suicide approximately two weeks after

defendant Dr. Frederic Lehman prescribed the drug Lexapro to treat

Sheridan's anxiety, depression and insomnia. Plaintiff asserted

that defendant was professionally negligent in prescribing the

drug and then failing to properly monitor Sheridan's condition for

possible negative side effects of Lexapro. Plaintiff also alleged

lack of informed consent, asserting that defendant failed to tell

Sheridan about the drug's possible side effects.

 The jury found that defendant did not deviate from

professional standards. The jury found a lack of informed consent,

and found that a reasonable person in Sheridan's situation either

would not have taken Lexapro or would not have continued taking

the drug, and that the "undisclosed risks" of the drug occurred.

However, the jury also found that Lexapro was not a proximate

 2 A-1573-14T1
cause of Sheridan's suicide.

 On this appeal, plaintiff contends that defense counsel made

improper statements during the trial; there were errors in the

jury instructions on informed consent and in one question on the

verdict sheet; the trial court improperly limited plaintiff's

cross-examination of defendant and improperly limited the

testimony of plaintiff's proximate cause expert; and the court

should have granted plaintiff's new trial motion. After reviewing

the record in light of the applicable legal standards, we find no

merit in any of those contentions. Plaintiff presented the same

arguments to the trial judge in her new trial motion. The judge

thoroughly and correctly decided the issues in his November 6,

2014 written opinion rejecting the motion. Except as further

addressed in this opinion, we affirm for the reasons stated by the

trial judge.

 I

 We begin by outlining the most pertinent trial evidence.

Lexapro is an anti-anxiety and anti-depressant drug belonging to

the class of selective serotonin reuptake inhibitors (SSRIs).

According to the prescribing information for Lexapro:

 Patients with major depressive disorder
 (MDD), both adult and pediatric, may
 experience worsening of their depression
 and/or the emergence of suicidal ideation and
 behavior . . . or unusual changes in behavior

 3 A-1573-14T1
 . . . and this risk may persist until
 significant remission occurs. Suicide is a
 known risk of depression . . . . There has
 been a long-standing concern . . . that
 antidepressants may have a role in inducing
 worsening of depression and the emergence of
 suicidality in certain patients during the
 early phases of the treatment. . . . [T]rials
 of antidepressant drugs (SSRIs and others)
 showed that these drugs increase the risk of
 suicidal thinking and behavior . . . in
 children, adolescents and young adults (ages
 18-24) with major depressive disorder . . .
 and other psychiatric disorders. Short-term
 studies did not show an increase in the risk
 of suicidality with antidepressants compared
 to placebo in adults beyond 24; there was a
 reduction with antidepressants compared to
 placebo in adults aged 65 and older.

 [Emphasis added.]

 The prescribing information further provides that all

patients being treated with antidepressants "should be monitored

appropriately and observed closely for clinical worsening,

suicidality1 and unusual changes in behavior, especially during

the initial few months." It advises that symptoms such as

agitation, insomnia and akathisia (psychomotor restlessness) could

occur. In addition, families and caregivers of patients being

treated with antidepressants "should be alerted about the need to

monitor patients for the emergence of agitation, irritability,

1
 "Suicidality" does not necessarily mean "suicide"; it means
having suicidal thoughts or suicidal actions or actually
committing suicide.

 4 A-1573-14T1
unusual changes in behavior . . . as well as the emergence of

suicidality, and to report such symptoms immediately to health

care providers."

 The black box warning stated:

 Warning, suicidality in antidepressant drugs:
 Antidepressants increase the risk, compared to
 placebo, of suicidal thinking and behavior
 . . . in children, adolescents, and young
 adults. . . . Anyone considering the use of
 Lexapro or any other antidepressant in a
 child, adolescent, or young adult must balance
 this risk with the clinical need. Short-term
 studies did not show an increase in the risk
 of suicidality with antidepressants compared
 to placebo in adults beyond age 24. . . .
 Patients of all ages who are started on
 antidepressant therapy should be monitored
 appropriately and observed closely for
 clinical worsening, suicidality, or unusual
 changes in behavior. Families and caregivers
 should be advised of the need for close
 observation and communication with the
 prescriber.

 [Emphasis added.]

 Plaintiff testified that in late May 2009, while she was

still recovering from a torn Achilles tendon, Sheridan began

experiencing an increase in work-related stress. On May 31,

Sheridan told her that he was not breathing right and that he

needed to go to the hospital. Sheridan drove himself to the

Community Medical Center in Toms River complaining of anxiety and

panic. He was given a psychiatric screening and a referral to

outpatient psychiatric care.

 5 A-1573-14T1
 Nicole Liberto, an outpatient social worker at the Community

Medical Center, spoke to Sheridan, who told her that he was having

a lot of anxiety and difficulty breathing due to a lot of people

being let go in his department and having to do their work. In

addition, he was taking on a lot of the responsibilities at home

due to his wife's recovery. Liberto diagnosed him as having an

anxiety disorder with panic attacks. After reviewing Sheridan's

case with her superiors, Liberto gave him a referral for a

psychiatrist.

 The same day, plaintiff obtained a ride to the hospital and

spoke to a social worker, whom she did not identify, who asked her

whether she thought Sheridan was suicidal. Plaintiff replied that

she did not believe he was. She testified that before this time

Sheridan had not been diagnosed with depression. The social worker

recommended to plaintiff that Sheridan make an appointment with a

psychiatrist. He attempted to do so, according to plaintiff, but

there were no openings that would be covered by his insurance for

thirty days. Instead, he made an appointment with a social

worker/psychologist, Kathy Freit.

 Prior to that appointment, Sheridan saw defendant, his

regular physician, on June 2, 2009. When Sheridan came home from

the appointment, he told plaintiff that defendant had diagnosed

him with anxiety and had given him medication. She saw ten

 6 A-1573-14T1
"blister packs" of Lexapro with seven in each pack. Sheridan also

was given a prescription for anxiety, according to plaintiff.

 Freit's deposition was read into the record. Freit stated

that she saw Sheridan on June 4, and that he presented with

moderate depression, but she did not believe that he had severe

psychiatric problems. He complained of constant stress and worry,

but denied any thoughts of suicide. Freit determined that Sheridan

had thought disturbances that were at least partially due to his

inability to help his wife in her recovery from surgery. He also

complained of feeling overwhelmed by his work and home

responsibilities. Based on the examination, Freit did not believe

that Sheridan was a threat to harm himself.

 After about a week on the medication, Sheridan called

defendant and plaintiff heard him say that he did not like the way

the medication was making him feel, and that he was not sleeping

any better and had trouble focusing. After he hung up, Sheridan

told plaintiff that defendant said that this was normal in the

early stages of taking Lexapro.

 A little later that day, Sheridan told plaintiff that he had

to go see defendant, and then left for the defendant's office.

When Sheridan returned, he told plaintiff that defendant had given

him a note putting him on disability until further notice for

severe anxiety and depression.

 7 A-1573-14T1
 Plaintiff testified that Sheridan began taking the Lexapro

"almost immediately"; she stated that after doing so, there were

times when he "wasn't there," "lacked focus," and was agitated.

Sheridan had never behaved like this before. He told her that he

did not like the way the Lexapro made him feel, at one point saying

that it made him feel "like a mental freak."

 Sheridan's mother-in-law testified that she saw Sheridan

after he started taking the medication. He told her that he felt

worse on the Lexapro, that he was very anxious, had trouble

sleeping, and was having nightmares when he did sleep. Sheridan's

son testified that in late May and early June 2009, Sheridan became

very withdrawn. Over the next week or two, Sheridan seemed worse.

On June 18, the son found Sheridan dead in the shed next to their

house. Sheridan had taken an overdose of various medications,

none of which were Lexapro.

 Sheridan left a suicide note, which read as follows:

 I'm not sure where to begin but I think
 I have been ill for some time. It's a dark
 place to be in. Somewhere along the way I had
 some kind of breakdown. I have tried to pull
 myself out but nothing seems to be working.
 Things have changed & will never be the same.
 I love you all so much. I want you to know
 this has nothing to do with you - it's all me.
 I'm ill & don't want to be a freak. You are
 all the best parts of my life & I am so proud
 of you. I tried to do the right things in my
 life & the best thing I did was find [Lorraine]
 & have wonderful kids. I hope that in time

 8 A-1573-14T1
 you will find it in your hearts to forgive me.
 I am so sorry. I love you all so much. I
 will do my best to watch over you.

 Defendant testified that Sheridan had become his patient in

2002. At the June 2, 2009 appointment, Sheridan complained of an

increase in stress at home and at work, and an inability to sleep.

He told defendant that he had a panic attack a couple of days

before and that he was feeling anxious and depressed. However,

he did not tell defendant that he had gone to the Community Medical

Center and that he had undergone a psychiatric crisis evaluation.

Defendant testified that he did not ask Sheridan if he had suicidal

thoughts because he knew Sheridan and his family, knew Sheridan

had no history of mental illness, and based on Sheridan's personal

circumstances, believed he "was low risk for suicide."

 Defendant noted that Sheridan had lost about thirty pounds

in less than a year, and defendant believed this was due to the

anxiety and depression. He ordered a blood test, and the results

were normal.

 Defendant testified that he had prescribed Lexapro to

patients many times and was aware of the black box warning. He

sought to treat Sheridan's depression with the Lexapro and the

anxiety with Ativan. He gave Sheridan a starter dose so that he

would not have to spend money in case the Lexapro did not work.

Defendant did not have samples of the Ativan, so he gave Sheridan

 9 A-1573-14T1
a prescription. He told Sheridan that both medicines could make

him feel tired, but did not tell him about the black box warning

because it did not apply to someone his age.

 Defendant spoke to Sheridan the following day, June 3, and

Sheridan told him that he was feeling better. Defendant told

Sheridan that if he had any concerns or problems, or began feeling

worse, to call him immediately. Sheridan called him five to seven

days later to tell him that he was still feeling anxious and

depressed. Defendant asked him how he felt in comparison to the

June 2 appointment. Sheridan replied, "A little bit better."

Defendant told him that it took a while for the drug to build up

in his system to the point where it would start making a

difference. Defendant denied that Sheridan said he felt weird,

or like a freak. Had he done so, defendant would have told him

to come in immediately.

 Dr. William Wertheim testified for plaintiff as an expert in

internal medicine. In Wertheim's opinion, defendant deviated from

the standard of care for an internal medicine physician by failing

to do an adequate assessment of Sheridan's depression, failing to

provide information about the risks of the treatment he was

offering, and failing to provide appropriate monitoring for the

treatment.

 Wertheim noted that the Physician's Desk Reference (PDR) on

 10 A-1573-14T1
Lexapro warned that patients given Lexapro should be monitored for

worsening of the condition, suicide and unusual behavior,

especially in the initial period of taking the drug. In addition,

there was a black box warning from the Food and Drug Administration

(FDA), which indicated a serious level of concern regarding the

risk of suicidal thinking. Physicians were also advised to inform

patients about the benefits and risks associated with the drug and

counsel them in its appropriate use.

 Wertheim further testified that the applicable standard of

care was to disclose the black box warnings to the patient,

particularly the increase in suicidality and worsening of

depression symptoms. An adequate assessment would have included

an assessment of Sheridan's suicide risk. Based on Sheridan's

presentation, defendant should have immediately given Sheridan an

appointment for a follow-up appointment within a week or two,

rather than relying on Sheridan to schedule an appointment.

 Wertheim opined that the failure to perform an adequate

assessment, failure to disclose the risks of the medication, and

failure to provide adequate monitoring and follow-up were

proximate causes of the suicide. The deviation was also a

proximate cause of Sheridan's suicide, according to Wertheim,

because the failure to monitor and to have a follow-up appointment

constituted a lost opportunity to prevent Sheridan from acting on

 11 A-1573-14T1
his suicidal ideation. In addition, because defendant failed to

disclose the risks of the medication, Sheridan was unable to give

an informed consent to the treatment, according to Wertheim.

 On cross-examination, Wertheim admitted that suicide was "the

greatest known risk" of depression; it was therefore important for

a doctor to put a patient with depression on anti-depressant

medication; and prescribing Lexapro was a proper treatment for

Sheridan's depression. He also admitted that, if plaintiff's

statements about her husband were correct, Sheridan took twice as

much Lexapro as defendant had instructed him to take. Dr. Wertheim

further admitted that the Black Box warning for Lexapro did not

state that the drug posed a risk of increased suicidal thinking

and behavior for persons of Sheridan's age. He also admitted he

knew of no scientific evidence that Lexapro increased the risk of

suicide in adults over the age of twenty-four.

 Focusing on a telephone call between Sheridan and plaintiff

a few days before the suicide, Dr. Wertheim admitted that, if

Sheridan did not say he was feeling "weird" but instead said that

he was feeling a little better, then there was no need for

defendant to schedule an immediate follow-up appointment for

Sheridan. He admitted that his opinion thus hinged on whether the

jury believed plaintiff's version of the phone call or defendant's

version.

 12 A-1573-14T1
 Dr. Peter Breggin, a psychiatrist, testified for plaintiff

on the issue of proximate cause. Breggin stated that a patient

could undergo a side effect from just one dose of an SSRI drug

like Lexapro, and a lot of side effects in the first three days.

He further testified that nightmares were one of "the single most

common adverse effects of SSRI's." In addition, he believed that

Sheridan's reported behavior was consistent with the side effect

of a distortion of reality. These side effects are particularly

acute, according to Breggin, in the first few weeks of taking the

drug. "It's a very common way people report the adverse effect.

They feel different or changed in a way they can't describe."

 In Breggin's opinion, based on the available literature,

Lexapro can cause suicidal behavior in adults as well as

adolescents. He analyzed Sheridan's suicide note and found that

it was consistent with Lexapro being a substantial factor in the

suicide because Sheridan did not blame anyone for his situation,

and because Sheridan felt as though something weird was going on

inside of him, and that he did not want to live "like a freak."

Thus, Breggin concluded that the Lexapro was a substantial factor

in Sheridan's suicide.

 On cross-examination, however, Dr. Breggin admitted that the

FDA had not found that Lexapro actually causes suicide, even in

children. He also testified that he did not believe that

 13 A-1573-14T1
antidepressant medications were an effective treatment for

depression. He admitted that his views were contrary to the

conclusions of the FDA and "the overwhelming literature in the

field of psychiatry[.]" Defense counsel also confronted Dr.

Breggin with numerous quotations from his own articles which

appeared to undermine the conclusions to which he testified on

direct examination.

 Dr. Kenneth Granet testified for defendant as an expert in

internal medicine. He opined that defendant did not deviate from

the applicable standard of care. He did not agree that defendant's

initial assessment of Sheridan was inadequate, particularly in

view of their lengthy doctor-patient relationship. He opined that

prescribing Lexapro was both safe and reasonable and that defendant

acted properly in ordering a blood test.

 Granet did not believe defendant acted improperly in not

discussing all the risks of the medicine contained in the PDR,

because "you cannot give every single side effect to a patient."

He testified that that would be time consuming and inappropriate.

Telling Sheridan that the drug would take seven to thirty days to

start to work, and that it could cause tiredness, complied with

the standard of care. Granet also believed that the dosage of

Lexapro was appropriate, and that prescribing Ativan at the same

time was appropriate to relieve the stress and anxiety immediately.

 14 A-1573-14T1
Giving a patient starter samples "happens all the time[,]"

according to Granet, and failing to give Sheridan the information

material that came with the samples was not a breach of the

standard of care. He added that only a small percentage of those

taking Lexapro suffered the side effects listed in the PDR.

 Granet testified that defendant did not breach the standard

of care in his monitoring of Sheridan. Two contacts within a

week's time and blood work was "perfectly reasonable." Nor did

failing to set a specific follow-up appointment breach the standard

of care. A physician would not schedule an appointment within two

weeks, according to Granet, because it typically takes longer than

two weeks for the drug to work. Had Sheridan reported that he

felt worse with the medication, then defendant should have

scheduled an appointment, or at least questioned him further

 Even assuming that defendant breached the standard of care,

Granet opined that the breach was not a substantial factor in the

suicide. Rather, the substantial factor was Sheridan's

depression. Granet pointed to the suicide note in which Sheridan

said that he had been sick for some time. Granet concluded

defendant could not have foreseen Sheridan's suicide.

 The defense also presented Dr. John Thompson, an expert in

psychiatry. Dr. Thompson opined that the most likely cause of the

suicide was Sheridan's depression, and that Lexapro was not a

 15 A-1573-14T1
proximate cause. Thompson testified that he did not know of any

literature that showed an increase in suicidality among Sheridan's

age group while taking Lexapro. He opined that the studies Dr.

Breggin relied on were limited in scope and outdated. Dr. Thompson

also testified that, in general, suicide due to taking Lexapro was

"extremely rare."

 When asked why Sheridan would have committed suicide while

taking Lexapro, Thompson explained that the medicine may not have

"kicked in fully yet[,]" or it might not have been the right SSRI

for Sheridan. He explained that the same SSRI may be effective

in treating one patient but not another. Thompson saw nothing in

the evidence to indicate that the Lexapro made Sheridan's mental

condition worse. Plaintiff's attorney did not cross-examine

Thompson, except to ask him how much he charged for his testimony.

 Dr. David Dunner, also testified for defendant as an expert

in psychiatry, specializing in the treatment of depression. Dunner

opined that the Lexapro did not cause or contribute to Sheridan's

suicide. He knew of no studies that found an increase in suicide

or suicidal thoughts among those in Sheridan's age who took

Lexapro. According to Dr. Dunner, akathisia, or agitation, which

plaintiff contended may have contributed to the suicide, occurs

in less than one percent of those taking SSRIs. Dr. Dunner

criticized the data in the studies Dr. Breggin relied upon as

 16 A-1573-14T1
"brief" and "anecdotal" and not scientifically valid.

 II

 On this appeal, plaintiff contends that defense counsel made

improper statements, warranting reversal of the verdict and a new

trial. Plaintiff's trial counsel did not object to most of those

statements, and we presume he did not object because he did not

perceive the comments as unfair or otherwise objectionable.

Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009).

Absent a trial objection, we review plaintiff's appellate

arguments for plain error. Ibid.; R. 2:10-2. Moreover,

"[f]leeting comments, even if improper, may not warrant a new

trial, particularly when the verdict is fair." Jackowitz, supra,

408 N.J. Super. at 505 (citing Dolan v. Sea Transfer Corp., 398

N.J. Super. 313, 332 (App. Div.), certif. denied, 195 N.J. 520

(2008)).

 Plaintiff first argues that defense counsel made disparaging

remarks about plaintiff's liability expert, Dr. Wertheim. Taken

in context, the comments about Dr. Wertheim were not improper.

Counsel merely pointed out to the jury that Dr. Wertheim was in

the courtroom and therefore would be aware of the defense's legal

theories when he testified.

 Moreover, counsel's primary comments about Dr. Wertheim - and

the focus of his attack on plaintiff's entire case - concerned the

 17 A-1573-14T1
lack of evidence that Lexapro causes suicide. Indeed, defense

counsel repeatedly reminded the jury that, in his opening

statement, plaintiff's counsel admitted to them that he could not

prove that Lexapro caused Sheridan's suicide. Defense counsel

also pointed out to the jury some information that plaintiff's

counsel failed to tell them in his opening statement - that Lexapro

has only been shown to cause an increase in "suicidality" among

young people up to age twenty-four, but not in adults over twenty-

four.

 Defense counsel also highlighted damaging admissions that Dr.

Wertheim had made in his deposition. Those perfectly proper

comments were far more damaging to plaintiff's case than defense

counsel's passing remarks about Dr. Wertheim being in the

courtroom. As previously noted, there was no objection to the

latter remarks and we find no plain error. R. 2:10-2.

 We agree with plaintiff that defense counsel improperly

speculated to the jury that Sheridan probably looked up information

about Lexapro on Google. However, that isolated remark, to which

there was no objection, did not have a clear capacity to produce

an unjust result. R. 2:10-2; Jackowitz, supra, 408 N.J. Super.

at 505. Defense counsel's comment was made in the context of

rebutting plaintiff counsel's opening assertion that Sheridan

never had a chance to find out the possible side effects of

 18 A-1573-14T1
Lexapro, because defendant did not explain them and did not give

Sheridan the package inserts when he gave him the Lexapro.

 In response, defense counsel told the jury that during the

case, they would hear that plaintiff, and one of the family's

children, also took antidepressants similar to Lexapro and,

therefore, Sheridan would have had access to package directions

accompanying those antidepressants. In that context, counsel also

argued to the jury that Sheridan, having a "type A" personality

and being a good parent, would not likely have allowed his child

to take an anti-depressant drug without reading about the

medication and its side effects. During those comments, counsel

stated that Sheridan probably Googled Lexapro. That was improper

speculation. However, we conclude it had no unfair impact on the

jury, because in its verdict, the jury found that defendant failed

to tell Sheridan about the side effects of Lexapro and found either

that Sheridan would not have taken Lexapro or would not have

continued taking it, had he been so informed. Consequently, we

find no plain error. R. 2:10-2.

 We find nothing improper in defense counsel's telling the

jury that they might, understandably, feel very sorry for

plaintiff, but that they should decide the case based on the trial

evidence and not on sympathy for her. In his opening remarks,

defense counsel skillfully anticipated and attempted to defuse

 19 A-1573-14T1
aspects of plaintiff's case that could be prejudicial to defendant.

The sympathy factor was one of those. There was no objection to

defense counsel's comments, because they were not objectionable.

 Although she raised no objection at trial, plaintiff now

complains about defense counsel's use of an analogy concerning a

banana peel. In his opening statement and his summation, the

attorney asked the jury to think of two situations - one where he

dropped a banana peel on the steps to the judge's bench, causing

the judge to slip and fall on the peel; and another in which he

dropped a banana peel elsewhere in the courtroom and nobody slipped

on it. The attorney explained that in both situations there was

negligence, but the negligence only caused injury in the first

situation. The analogy was designed to explain to the jury the

defense theory that, even if defendant was professionally

negligent or failed to fully inform Sheridan about the risks of

Lexapro, his conduct did not cause Sheridan's suicide. Viewed in

context, there was nothing improper in the banana peel analogy.

Contrary to plaintiff's argument, the analogy was not likely to

mislead the jury into believing that plaintiff needed to prove

Lexapro was the only causal factor in Sheridan's injury.

 In a related argument, plaintiff contends that defense

counsel misstated the law in his summation, in telling the jury

that if they did not find that Lexapro caused defendant's suicide,

 20 A-1573-14T1
the case was "over." However, after an objection and a sidebar

conference, defense counsel backtracked, properly urged the jury

to focus on whether Lexapro was "a substantial factor in causing

[Sheridan's] death[,]" and argued that it was not a factor.

Additionally, in the final charge to the jury, the trial judge

correctly instructed them about the concept of proximate cause.

The verdict sheet also correctly asked the jury whether the

medication was a proximate cause - not the proximate cause - of

Sheridan's suicide. The jury answered "no." We agree with the

trial judge that defense counsel's statement in summation did not

warrant a new trial.

 Next, plaintiff contends that in his summation, defendant's

attorney crossed the line of proper cross-examination in

questioning plaintiff's proximate cause expert, Dr. Breggin.

Again, the trial judge thoroughly and correctly rejected the same

argument in his November 6, 2014 opinion.

 We agree with plaintiff that defense counsel should not have

stated to the jury that if they Googled Dr. Breggin's name after

the trial was over, they would discover "that he was against his

own field of psychiatry" and "does whatever he can to promote his

books . . . against the psychiatric field." However, on this

record, we find no plain error. R. 2:10-2. In his testimony, Dr.

Breggin himself emphasized to the jury how famous he was, including

 21 A-1573-14T1
names of well-known talk shows on which he appeared, and how many

popular books he had written. He also freely admitted that he was

a maverick in the field of psychiatry and that his views on SSRI

medications were outside the mainstream of his profession.

Counsel's brief comment did not have "a clear capacity to produce

an unjust result," particularly in light of the strong defense

evidence undermining Dr. Breggin's testimony. R. 2:10-2.

 Plaintiff's remaining appellate arguments were presented to

the trial judge on plaintiff's motion for a new trial. In his

comprehensive opinion, the judge thoroughly and correctly

addressed those issues and we affirm for the reasons he stated.

Except for the following brief comments, no further discussion is

required as to those issues. R. 2:11-3(e)(1)(E).

 At the charge conference, defense counsel not only failed

to request a Scafidi2 charge, but he agreed with the judge that

this was not a "Scafidi" case and he agreed with the judge's

proposal to charge the jury using Model Jury Charge (Civil) 6.10

and 6.13. In fact, he reaffirmed that position just before the

2
 Scafidi v. Seiler, 119 N.J. 93 (1990); Model Jury Charge (Civil)
5.50E, Pre-Existing Condition–Increased Risk/Loss of Chance
Proximate Cause.

 22 A-1573-14T1
judge read the charge to the jury.3 We find no error, much less

plain error, in the proximate cause charge.

 Plaintiff's argument that the trial judge unduly limited Dr.

Breggin's testimony is likewise without merit. Dr. Breggin was

precluded from testifying about the standard of care or defendant's

alleged deviation from the standard, because he did not practice

medicine in the same specialty area as defendant. See N.J.S.A.

2A:53A-41(a); Nicholas v. Mynster, 213 N.J. 463, 487-88 (2013).

The judge properly limited Dr. Breggin's testimony to proximate

cause issues, but permitted him to testify fully as to those

issues.

 In summary, plaintiff's case, while sympathetic, suffered

from fundamental weaknesses of proof. In particular, the

Physician's Desk Reference and package inserts for Lexapro

indicated there was no scientific evidence that Lexapro caused

suicide, or even suicidal thinking, in adults over the age of

twenty-four. In addition to the defense experts, plaintiff's own

3
 We decline to consider the claim, asserted in plaintiff's brief,
that her counsel requested a Scafidi charge at an unrecorded in-
chambers portion of the charge conference. If plaintiff believed
that the appellate record did not accurately reflect what occurred
at the trial, she should have filed a motion to supplement or
correct the record. R. 2:5-3(f); Ryan v. Brown, 279 N.J. Super.
648, 651-52 (App. Div. 1995). We will not consider an appellate
argument for which no adequate record has been provided. Id. at
651.

 23 A-1573-14T1
liability expert, Dr. Wertheim, admitted there was no scientific

evidence establishing that Lexapro causes suicide. His testimony

contradicted the testimony of plaintiff's causation expert, Dr.

Breggin. Additionally, with the exception of Dr. Breggin, all of

the relevant witnesses testified that suicide was the most serious

risk posed by depression, a view confirmed by the PDR and the

package insert for Lexapro.

 According to defendant, Sheridan told him he was feeling "a

little bit better" a few days after starting to take the Lexapro.

And Sheridan left a suicide note indicating that he had not been

feeling normal for a long time, thus casting doubt on plaintiff's

theory that the Lexapro caused Sheridan's suicide. Moreover,

plaintiff's causation expert, Dr. Breggin, was effectively

impeached on cross-examination, and reasonable jurors may have

found his testimony unpersuasive.4

 Like the trial judge, we cannot conclude that the verdict was

a miscarriage of justice. R. 2:10-2.

 Affirmed.

4
 Defense counsel's one improper question to Dr. Breggin,
concerning "genocide," was the subject of an immediate objection.
The judge sustained the objection and properly directed the jury
to disregard the question. On this record, the question clearly
did not lead the jury to reach a verdict it otherwise would not
have reached. R. 2:10-2; State v. Macon, 57 N.J. 325, 337 (1971).

 24 A-1573-14T1